# STATE OF CONNECTICUT *v.* EVAN JARON HOLMES
## (SC 20048)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of felony murder, home invasion, conspiracy to commit home invasion and criminal possession of a firearm, the defendant appealed to the Appellate Court, claiming that the trial court had improperly overruled his objection to the prosecutor's use of a peremptory challenge to excuse a prospective, African-American juror, W. During voir dire, the prosecutor questioned W, who previously had disclosed that he was employed as a social worker and performed volunteer work directly with prison inmates, regarding his interactions with the police and his opinions of the criminal justice system. In response, W indicated that he sometimes feared being stopped by the police while driving, he had family members who had been convicted of crimes and incarcerated, and he believed that certain groups of individuals are disproportionately convicted of crimes and receive disproportionate sentences. W further expressed that his concerns were largely informed by his life experiences as an African-American. In objecting to the prosecutor's peremptory challenge, defense counsel argued that it was in violation of the United States Supreme Court's decision in *Batson* v. *Kentucky* (476 U.S. 79), which prohibits a party from challenging potential jurors solely on account of their race. The prosecutor explained that the basis for the peremptory challenge was W's stated distrust of law enforcement and his concern about the fairness of the criminal justice system, as borne out by his life experiences. The prosecutor also noted that the peremptory challenge was not based on W's race but, rather, related only to the particular viewpoints that W had expressed. After the trial court overruled the defendant's *Batson* challenge, it excused W from the venire. The Appellate Court affirmed the trial court's judgment and, relying on *State* v. *King* (249 Conn. 645), concluded that the prosecutor's explanation of W's distrust of the police

334 Conn. 202     DECEMBER, 2019          203

State *v.* Holmes

and concern regarding the fairness of the criminal justice system constituted a nondiscriminatory, race neutral reason for exercising the peremptory challenge. In so doing, the Appellate Court rejected the defendant's argument that the prosecutor's stated explanation was not race neutral because it had a disproportionate impact on African-Americans. The Appellate Court further concluded that there was no evidence that the prosecutor's explanation was a pretext for intentional discrimination. On the granting of certification, the defendant appealed to this court, claiming that the Appellate Court incorrectly concluded that the trial court had properly denied his *Batson* challenge and that this court should overrule *King* and its progeny and hold that distrust of the police and concern regarding the fairness of the criminal justice are not race neutral reasons for exercising a peremptory challenge in light of the disparate impact on prospective jurors of minority races. *Held*:

1. The Appellate Court properly upheld the trial court's rejection of the defendant's *Batson* challenge, and this court declined the defendant's request to overrule *King* and its progeny establishing that distrust of the police and concern regarding the fairness of the criminal justice are race neutral reasons for exercising a peremptory challenge: this court's holdings in *King* and its progeny remain consistent with federal constitutional law, which was the sole basis for the defendant's claim on appeal, and, pursuant to federal constitutional law, the distrust of law enforcement or the criminal justice system is a race neutral reason for exercising a peremptory challenge; in the present case, the prosecutor's proffered explanation for striking W from the jury was facially race neutral as a matter of law, even if it had a disparate impact on minority jurors, who are more likely to have negative interactions with the police or concerns regarding the fairness of the criminal justice system, because it was based not on W's race but, rather, on the viewpoints that he espoused, which may be shared by whites and minorities alike, and, because the defendant did not challenge on appeal the Appellate Court's conclusion that the trial court correctly determined that the prosecutor's proffered explanation for the peremptory strike was not a pretext for purposeful discrimination, the Appellate Court properly affirmed the judgment of conviction.

2. In light of systemic concerns identified by this court regarding the failure of *Batson* to address the effects of implicit bias and the disparate impact that certain race neutral explanations for peremptory challenges have on minority jurors, this court announced that it would convene a Jury Selection Task Force, appointed by the Chief Justice and composed of relevant stakeholders in the criminal justice and civil litigation communities, to study the issue of racial discrimination in the selection of juries, to consider measures intended to promote the selection of diverse jury panels, and to propose necessary changes, to be implemented by court rule or legislation, to the jury selection process in Connecticut.

(*Two justices concurring separately in one opinion*)

Argued January 18—officially released December 24, 2019

State *v.* Holmes

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, home invasion, conspiracy to commit home invasion, burglary in the first degree and criminal possession of a firearm, brought to the Superior Court in the judicial district of New London, where the first five counts were tried to the jury before *Jongbloed, J.*; verdict of guilty of the lesser included offense of manslaughter in the first degree with a firearm, felony murder, home invasion, conspiracy to commit home invasion, and burglary in the first degree; thereafter, the charge of criminal possession of a firearm was tried to the court; judgment of guilty; subsequently, the court vacated the verdict as to the lesser included offense of manslaughter in the first degree with a firearm and burglary in the first degree, and rendered judgment of guilty of felony murder, home invasion, conspiracy to commit home invasion, and criminal possession of a firearm, from which the defendant appealed to this court; thereafter, the appeal was transferred to the Appellate Court, *Prescott* and *Beach, Js.*, with *Lavine, J.*, concurring, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Alan Jay Black*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Paul J. Narducci*, senior assistant state's attorney, and, on the brief, *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

ROBINSON, C. J. From its inception, the United States Supreme Court's landmark decision in *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d

State *v.* Holmes

69 (1986), has been roundly criticized as ineffectual in addressing the discriminatory use of peremptory challenges during jury selection, largely because it fails to address the effect of implicit bias or lines of voir dire questioning with a disparate impact on minority jurors.[1] Consistent with these long-standing criticisms of *Batson*, the defendant, Evan Jaron Holmes, asks us in this certified appeal[2] to overrule the line of cases in which this court held that a prospective juror's negative views about the police and the fairness of the criminal justice system constitute a race neutral reason for the use of a peremptory challenge to strike that juror. See, e.g., *State* v. *King*, 249 Conn. 645, 664–67, 735 A.2d 267 (1999). We conclude that the challenged line of cases, on which the Appellate Court relied in upholding the defendant's conviction of felony murder on the basis of its rejection of his *Batson* claim arising from the prosecutor's use of a peremptory challenge during jury selection; see *State* v. *Holmes*, 176 Conn. App. 156, 175–77, 169 A.3d 264 (2017); remains consistent with the federal constitutional case law that provides the sole basis for the *Batson* claim. Accordingly, we affirm

---

[1] See, e.g., *Batson* v. *Kentucky*, supra, 476 U.S. 106 (Marshall, J., concurring); *State* v. *Veal*, 930 N.W.2d 319, 359–61 (Iowa 2019) (Appel, J., concurring in part and dissenting in part); *State* v. *Saintcalle*, 178 Wn. 2d 34, 46–49, 309 P.3d 326 (overruled in part on other grounds by *Seattle* v. *Erickson*, 188 Wn. 2d 721, 398 P.3d 1124 [2017]), cert. denied, 571 U.S. 1113, 134 S. Ct. 831, 187 L. Ed. 2d 691 (2013); J. Bellin & J. Semitsu, "Widening *Batson*'s Net To Ensnare More Than the Unapologetically Bigoted or Painfully Unimaginative Attorney," 96 Cornell L. Rev. 1075, 1077–78 (2011); N. Marder, "*Foster* v. *Chatman*: A Missed Opportunity for *Batson* and the Peremptory Challenge," 49 Conn. L. Rev. 1137, 1182–83 (2017); A. Page, "*Batson*'s Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge," 85 B.U. L. Rev. 155, 178–79 and n.102 (2005); T. Tetlow, "Solving *Batson*," 56 Wm. & Mary L. Rev. 1859, 1887–89 (2015).

[2] We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court err in determining that the trial court properly denied the defendant's challenge under *Batson* v. *Kentucky*, [supra, 476 U.S. 96–98]?" *State* v. *Holmes*, 327 Conn. 984, 175 A.3d 561 (2017).

State *v.* Holmes

the judgment of the Appellate Court in this case but
refer the systemic concerns about *Batson*'s failure to
address the effects of implicit bias and disparate impact
to a Jury Selection Task Force, appointed by the Chief
Justice, to consider measures intended to promote the
selection of diverse jury panels in our state's court-
houses.

The record and the Appellate Court's opinion reveal
the following relevant facts and procedural history.
In connection with a shooting at an apartment in New
London,[3] the state charged the defendant with numer-
ous offenses, including felony murder in violation of
General Statutes § 53a-54c, and the defendant elected
a jury trial.[4] "On the first day of jury selection, defense
counsel noted that the entire venire panel appeared to
be 'white Caucasian' and that every prospective juror
who had completed a jury questionnaire had indicated
that they were either white or Caucasian, or had not
indicated a race or ethnicity.[5]

---

[3] For a detailed recitation of the underlying facts of this case, see *State*
v. *Holmes*, supra, 176 Conn. App. 159–62.

[4] Specifically, the state charged the defendant with murder in violation
of General Statutes § 53a-54a (a), felony murder in violation of § 53a-54c,
home invasion in violation of General Statutes § 53a-100aa (a) (2), conspiracy
to commit home invasion in violation of General Statutes §§ 53a-48 (a) and
53a-100aa, burglary in the first degree in violation of General Statutes § 53a-
101 (a) (1), and criminal possession of a firearm in violation of General
Statutes § 53a-217.

By agreement of the parties, the charge of criminal possession of a firearm
was severed from the remaining counts and tried to the court. The parties
stipulated that the defendant had a prior felony conviction, and the trial
court subsequently found the defendant guilty of that offense.

[5] Defense counsel observed for the record that the defendant "is of mixed
race" and that, on the basis of his observation of the questionnaires and
the jury panel on the first day, "[there are] no Hispanic surnames, no African-
Americans, no Asians, [there are] no Indians or [Middle] Easterners, [there
are] no Pacific Islanders. It's 100 percent, from my view, [a] white Caucasian
jury panel that was brought in." He indicated that he might put on the record
that a prospective juror who had not answered the racial identification
question on the questionnaire appeared to be white or Caucasian in the
event that person was excused from service.

State *v.* Holmes

"On the second day of jury selection, only one prospective juror had indicated on the questionnaire that he or she was African-American. During the voir dire examination of one venireperson, W.T.,[6] he stated to defense counsel that he was African-American. W.T. indicated that he had obtained a master's degree in social work from the University of Connecticut and currently was employed by the state . . . as a supervisory social worker with the Department of Children and Families.

"He also disclosed that he performed volunteer work for the Department of Correction and had worked directly with inmates. When asked by defense counsel whether that work might affect him as a juror, W.T. responded: 'Because I work with, like I say, inmates, and also my work, I do—I mean, you see a lot of different things and you see a lot of sad situations. I'm sure as a professional and because I work with people who've been through a lot of stuff, you know, I'm sure I have an understanding of what they're doing. And also, just—just in the criminal justice system in general, I know how sometimes people are not, you know, given a fair trial or they [maybe] disproportionately have to go to jail and different things of that nature. So, part of my whole experience is as an African-American, as an American and also studying these situations, I know that there's a lot of issues [going] on in various systems. The criminal justice system, the educational system and various systems, but people are not fairly treated, so I know that much. But I don't use that, you know, I can—I could make a professional—and I think keep my composure and do my job just like—as a professional, as I work—even as I do volunteer work, but you have to know the reality in life as well, though.' In

_____

[6] "In accordance with our usual practice, we identify jurors by initial in order to protect their privacy interests." *State* v. *Berrios*, 320 Conn. 265, 268 n.3, 129 A.3d 696 (2016).

State *v.* Holmes

response to a subsequent question by defense counsel regarding whether, in light of his life experiences, he could be fair to both sides in the case, W.T. stated that he could.

"During the state's voir dire examination of W.T., the following exchange occurred:

" '[The Prosecutor]: Now, you've obviously had a little more dealing with the court systems than most—most people that we see in through here. Have you formulated any opinions about the criminal justice system based on your experiences? Is it too lenient, too stringent, it works, it doesn't work; any feeling about that?

" '[W.T.]: And like I said, probably already share[d] too much stuff about—that talk about in terms of I have seen people, have had family members [who] went to prison before.

" '[The Prosecutor]: Right.

" '[W.T.]: And I just think—I think that's why I became a social worker, because I wanted to make a difference, and that's why I have been doing mentoring programs—

" '[The Prosecutor]: Yep.

" '[W.T.]: —try[ing] to help young people so they won't get into trouble. So, I meant the system, all various systems, there's a lot of discrimination [that] still goes out. Even today, ladies are still not getting equal pay. So, it's a lot. We've come a long way, but we have a long way to go.

" '[The Prosecutor]: Right.

" '[W.T.]: But I think I can make—I could keep the facts and be able to look at the facts of the case and judge by the facts.

" '[The Prosecutor]:  .  .  .  We need to know how you're feeling, so we can make the appropriate assess-

State *v.* Holmes

ment and you can make the appropriate assessment.
. . . I think that it's not a perfect system, but it's improv-
ing every day, and [there are] not as many systems that
I can think of that are, any—come anywhere close. One
of the concerns that people may have is, jurors who
are in the—using their time as a juror to try to fix the
system. You indicated, and I think you said, that you
would listen to the evidence and decide it on the evi-
dence and you wouldn't let any concerns that you had
filter in.

" '[W.T.]: That's correct.

" '[The Prosecutor]: Fair to say?

" '[W.T.]: That's correct.

" '[The Prosecutor]: Okay. And so . . . you would
sit and listen to what all the evidence is and make a
decision based on the evidence?

" '[W.T.]: That's correct. . . .

" '[The Prosecutor]: Okay. With respect to that, as
much as you know about those situations, were you
satisfied with the way the police reacted to your family
. . . or friend being the victim of a crime?

" '[W.T.]: Sometimes and sometimes not.

" '[The Prosecutor]: Okay.

" '[W.T.]: So-so.

" '[The Prosecutor]: Fair to say that it's an individual
situation and that the police have been—have acted in
a way that was satisfactory toward your family mem-
bers or friends, and in other situations they weren't
satisfied with what the police did?

" '[W.T.]: That's correct.

" '[The Prosecutor]: Okay. Had you had any interac-
tions with the police in any respect in which you devel-

State *v.* Holmes

oped an—either a strong, favorable impression or an unfavorable impression about the police and the way they treated you in any situation, speeding tickets, calling up to complain about [a] noisy neighbor, something with work?

" '[W.T.]: I'm, like—just growing up in this society, I fear, you know, I fear [for] my life. I got a new car, I feared that, you know, I might get stopped, you know, for being black, you know. So, you know, that's concerning and sometimes I get afraid—even me, you know, I—when I see the police in back of me, I wonder, you know, if I'm going to be stopped.

" '[The Prosecutor]: Okay. Now with—with respect to that, there will probably be police officers who will be testifying here, and the judge will tell you that [you] can't give a police officer more credibility merely because [he or she is] a police officer. Conversely, though, they don't get less credibility merely [because] they are police officers. They are to be treated like anybody else. Would you have any difficulty following the judge's instructions concerning that?

" '[W.T.]: No, I wouldn't.

" '[The Prosecutor]: Okay. And I can appreciate what you're saying. Obviously, I haven't been in that—in your shoes. I haven't been in your situation, nor do we ask the jury to put themselves in the shoes of either the police or a particular defendant. We can't ask you to do that. But having now life's experience, is that something that you think you can put aside and decide the evidence based on everything that's presented to you, or is there some concern that you might have that you might not be able to do that?

" '[W.T.]: No, I will be able to because another thing, too, is, I know good police officers who are—who are

State *v.* Holmes

good people, nice people, mentors who work in the community. So—so, yes, I'd be able to.

" '[The Prosecutor]: Okay. Okay. And have you had . . . positive experiences with the police as well?

" '[W.T.]: Yes.

" '[The Prosecutor]: Okay. So, I guess like anybody else, there are bad lawyers and there are good lawyers. There are bad social workers, there are good social workers. . . . But what I'm driving at is, we make an individual assessment based on what we hear and what we see and what we listen to. And that is what we're going to ask you to do if you're a juror.

" '[W.T.]: Yes.

" '[The Prosecutor]: We want to make sure you don't carry in any preconceived notions one way or the other.

" '[W.T.]: Yes.

" '[The Prosecutor]: No problems with that?

" '[W.T.]: No problem.

" '[The Prosecutor]: Okay. We can count on your word on that, then?

" '[W.T.]: That's right.

" '[The Prosecutor]: Okay. I asked about being the victim of a crime and your family member. The flip side to that, have you, any member of your family or any close personal friends ever been either accused or ever convicted of crimes?

" '[W.T.]: Yes. I have family members who've been in—who served time in jail.

" '[The Prosecutor]: Okay. This obviously is a crime of violence. Any—any family members who have been convicted of crimes of violence?

State *v.* Holmes

" '[W.T.]: No. . . .

" '[The Prosecutor]: You mentioned that your family members have—have served time. With respect to that, were—did you develop any feelings about the way the police had treated your family members in those situations?

" '[W.T.]: Well, I think the—like I told you earlier, my life experiences living in this world—

" '[The Prosecutor]: Right.

" '[W.T.]: —you see that things are not fair. And then you—I mean, you—you experience things, you know, and you see things happen. And some things are not fair, some things not—not all people are the same, all police are not bad or, like, you know, just like you said everybody, but when you see firsthand your own family members, then you experience something a little bit different.

" '[The Prosecutor]: Of course.

" '[W.T.]: Other people who, you know, so—

" '[The Prosecutor]: Of course. And I guess it's kind of tough, because I—you know, I could ask you questions all day long and I'm not going to get to know you as well [as] you know yourself. But there's a difference, I think, between I'm upset that my family member had to go through this versus I'm upset that the police treated my family member in such a way. Do you understand the distinction I'm trying to make, that you're not satisfied that your family member ended up in prison versus I'm not satisfied that they were treated properly by either the court system or by the police. There's a difference, and I'm not sure I'm explaining it very well.

" '[W.T.]: Are you saying more, like, for instance, like, someone may have gone to jail because they did something wrong—

" '[The Prosecutor]: Right.

State *v.* Holmes

" '[W.T.]: —and they had to pay the consequences.

" '[The Prosecutor]: Right. And you know, like that, but—

" '[W.T.]: So—exactly. You have to—even if it's your family member or not, you did something wrong, you need to pay the consequences.

" '[The Prosecutor]: Right.

" '[W.T.]: You need to pay the consequences for whatever you've done wrong, you know.

" '[The Prosecutor]: Right.'

"Following the voir dire examination, defense counsel stated that W.T. was acceptable to the defendant. The [prosecutor], however, exercised a peremptory challenge and asked that W.T. be excused." (Footnotes added.) *State* v. *Holmes*, supra, 176 Conn. App. 162–69.

"[Defense counsel] immediately raised a *Batson* objection to the [prosecutor's] use of a peremptory challenge, citing the fact that W.T. was the first African-American venireperson to be examined and that, in essence, W.T. had assured the court and the [prosecutor] that, regardless of his views about the criminal justice system or the police, he could be a fair and impartial juror." (Footnote omitted.) Id., 169. In his argument, defense counsel compared W.T.'s assurances that he could be fair with the voir dire of another member of the venire, a young white man from New London, who had "said that he couldn't be fair because of incidents with . . . police officers," observing that, "if he had been black or white, the kid had to go. You know, [there are] clearly some people [who] can't be jurors. I don't see why [W.T.] shouldn't be seated."

"The [prosecutor] then responded: 'I understand exactly where [defense counsel] is coming from, would agree with him for the most part with the exception of, I do believe that there are race neutral reasons for this.

State *v.* Holmes

It was somewhat of a struggle for me, but I looked at some of the answers. And even though he responded favorably after further questioning, the concerns that I did have [were] the—the comments that—about [a] disproportionate amount of people being sent to jail, disproportionate amount of jail time, the fact that he's had family members who have been convicted and have served time, the fact that he works to rehabilitate people. And none of this is per se bad, but I think in the context of this particular case, it's important, it's race neutral. If we had a Caucasian who was in the same situation, the exercising of a peremptory challenge would be the same, I think.

" 'Additionally, the fact that he did mention . . . his concern about and his life's experience about driving and seeing a police officer behind him and his concern about police officers. Yes, he said that there are other police officers who are good and people can be good, but there is that life's experience that I would submit would make it difficult for him to be fair and impartial in this particular—in this particular case.

" 'Again, I understand exactly what [defense counsel] is saying. I believe that they are race neutral reasons, and I was exercising the peremptory based on those race neutral reasons.'

"The court then asked for argument . . . and defense counsel gave the following response: 'With respect to being, as an African-American male, fearful when the police are behind you, I mean, that's just, you know, something that [the prosecutor] and I never have had to deal with . . . but if this gentleman sitting next [to] me is entitled to a jury of his peers, we've picked three white people already. We've accepted them. I mean, isn't he—and that's a common complaint by African-American people, that they feel that they get pulled over too often, and there are probably studies that say it's disproportionate. So, that particular reason does seem to me to be race based . . . . It was [W.T.'s] view

State *v.* Holmes

and, I mean, again, that's—he's entitled to a jury of his peers, and we get nobody who feels that way or has those thoughts is not really his peers because that's probably the experience or experiences [that] a lot of African-Americans go through.'

"The prosecutor, when asked if he wanted to argue further, stated: 'Only briefly, and maybe it's a matter of semantics. I think [*Batson*] is, oh, I see an African-American gentleman, I see an Asian-American, I see a Hispanic, I'm going to excuse them. If an African-American comes in with a distrust of the police and will not listen to a police officer and says he will not listen to a police officer, that isn't a challenge based on that person's race or ethnicity; it's a challenge based on that person's personal views.

" 'If a white—a Caucasian person came in and said, I don't like being followed by the cops because I [have seen] a number of cops punch friends of mine in the face, it's not because he is a Caucasian, it's because of life's experiences. And I think that's what I would be arguing, that the comments that were made were not because of his ethnicity or his race, but rather his—his expressed opinions. And I think it's a distinction, I think it's a legitimate distinction, but I defer to Your Honor with respect to this.' " Id., 169–71.

The trial court then denied the defendant's *Batson* challenge, comparing W.T. to the white juror who previously had been excused because of his negative comments about the police, and stating: "I do think that, in both situations, it's an issue with regard to negative contact with the police and that, I believe, has been found to be a legitimate race neutral reason for exercising [a] peremptory challenge. So, under all the circumstances, I am going to find that the [prosecutor] has given a race neutral reason for exercising a peremptory

State *v.* Holmes

challenge in this case, and I'm going to overrule the *Batson* challenge.''[7]

"Throughout the remainder of the voir dire process, the [prosecutor] asked a uniform set of questions of all jurors. Furthermore, three African-American jurors were selected to serve in this case—two as regular jurors and one as an alternate juror.'' Id., 171.

After a ten day trial, the jury returned a verdict of guilty of, inter alia, felony murder. The trial court subsequently rendered a judgment of conviction and sentenced the defendant to a total effective sentence of seventy years imprisonment.[8]

The defendant appealed from the judgment of conviction to the Appellate Court, claiming that the trial court improperly overruled his *Batson* objection to the

---

[7] "Following the filing of this appeal, the defendant filed with [the Appellate Court] a motion for articulation, which was referred to the trial court pursuant to Practice Book § 66-5. The trial court granted the motion and in a memorandum concluded that all of the reasons set forth by the [prosecutor] in exercising [the] peremptory challenge were race neutral.'' *State* v. *Holmes*, supra, 176 Conn. App. 171. Specifically, the trial court cited, inter alia, this court's decisions in *State* v. *King*, supra, 249 Conn. 664–67, *State* v. *Hodge*, 248 Conn. 207, 231, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999), and *State* v. *Smith*, 222 Conn. 1, 13–15, 608 A.2d 63 (1992), for the proposition that "negative contact with the police" is a "legitimate, race neutral reason for exercising a [peremptory] challenge.'' The trial court then determined that the defendant had not met his burden of persuading the court by a preponderance of the evidence that the explanations were pretextual or insufficient. The trial court also observed in its articulation that "the other reasons given by the [prosecutor] for exercising the peremptory challenge were also race neutral. Those reasons included the expressed view that the criminal justice system was not fair, the venireperson had family members who had been convicted and served time, and that he worked to rehabilitate people.''

[8] Specifically, the defendant was found guilty on all of the counts tried to the jury and the count tried to the court; see footnote 4 of this opinion; except for murder, as the jury instead found the defendant guilty of the lesser included offense of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a). In rendering its judgment of conviction, the trial court vacated the convictions of manslaughter and burglary in the first degree pursuant to *State* v. *Polanco*, 308 Conn. 242, 255, 61 A.3d 1084 (2013).

State *v.* Holmes

prosecutor's use of a peremptory challenge on W.T.[9] The Appellate Court relied on this court's decisions in *State* v. *Edwards*, 314 Conn. 465, 102 A.3d 52 (2014), and *State* v. *King*, supra, 249 Conn. 645, among other cases, and concluded that "[d]istrust of the police or concerns regarding the fairness of the criminal justice system are viewpoints that may be shared by whites and nonwhites alike. In other words, the prosecutor's questions regarding potential jurors' attitudes about the police and the criminal justice system are likely to divide jurors into two potential categories: (1) those who have generally positive views about the police and our criminal justice system, and (2) those who have generally negative views of the police or concerns regarding the criminal justice system." *State* v. *Holmes*, supra, 176 Conn. App. 175–76. The Appellate Court further observed that "the prosecutor . . . also did not refer to race in his explanation except as necessary to respond to the *Batson* challenge" and that Connecticut case law, including this court's decisions in *State* v. *King*, supra, 644–64, *State* v. *Hodge*, 248 Conn. 207, 231, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999), and *State* v. *Hinton*, 227 Conn. 301, 327, 630 A.2d 593 (1993), supported the proposition that "such explanations are facially neutral." *State* v. *Holmes*, supra, 176; see id., 180 (emphasizing that, as intermediate appellate court, it was bound by *King*).

The Appellate Court rejected the defendant's "disproportionate impact" argument, namely, that "resentment

[9] The Appellate Court rejected the defendant's other claims on appeal, namely, that (1) the trial court improperly admitted a tape-recorded statement of a witness pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and (2) the state violated his right to remain silent under *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), "when it cross-examined him at trial about his failure to disclose to the police at the time of his arrest certain exculpatory information that he later testified to at trial." *State* v. *Holmes*, supra, 176 Conn. App. 185. These claims are not before us in this certified appeal.

State *v.* Holmes

of police and distrust of the criminal justice system
are not racially neutral justifications for exercising a
peremptory challenge because there is a much higher
prevalence of such beliefs among African-Americans,''
as not legally cognizable under the second step of the
*Batson* rubric, which requires only a facially valid expla-
nation. Id., 177. The Appellate Court further concluded
that there was no evidence that the prosecutor had
used W.T.'s distrust of the criminal justice system as a
pretext for intentional discrimination under *Batson*'s
third step.[10] Id., 179; see id., 182 (emphasizing that prose-
cutor was not required to accept at "face value" W.T.'s
assurances that, "despite his expressed concerns and
fears, he believed that he could follow the court's
instructions and act as an impartial juror"). Accord-

_____

[10] The Appellate Court observed that the six factors articulated in *State*
v. *Edwards*, supra, 314 Conn. 485–86, for determining whether the prosecutor
had acted with discriminatory intent in using a peremptory challenge on
W.T. all "support the [trial] court's conclusion that the [prosecutor] properly
exercised [his] right to use a peremptory challenge with regard to W.T.

"First, the [prosecutor's] reasons for excluding W.T. were his stated dis-
trust of [the] police and the criminal justice system, which clearly related
to the trial of this case because it is a criminal proceeding in which police
[officers] would provide significant evidence. Second, the [prosecutor] did
not exercise [his] peremptory challenge without questioning W.T. but, rather,
engaged in a detailed discussion with W.T. about the views he had expressed
in response to defense counsel's questions. Third, the defendant concedes,
and our review of the record confirms, that the [prosecutor] asked a relatively
uniform set of questions of all jurors. Accordingly, W.T. and the other African-
American venirepersons were not asked questions that were not asked of
other jurors or that sought to elicit a particular response. Fourth, we are
unaware of any venireperson of a race different from W.T.'s, who expressed
the same or similar views regarding [the] police and the criminal justice
system as those of W.T. but nevertheless was permitted to serve on the
defendant's jury. Fifth, the [prosecutor] did not advance any explanation
that was based on an inapplicable group trait. Finally, and perhaps most
significantly, the [prosecutor] did not use a disproportionate number of
peremptory challenges to exclude African-Americans from the jury. In fact,
as the defendant acknowledges, three African-Americans were selected to
serve, two as regular jurors and one as an alternate. Although the racial
composition of an empaneled jury certainly is not dispositive of the issue
of impermissible motive for use of a peremptory strike as to a particular
juror, it is among the various factors that a reviewing court can consider
in evaluating whether the explanation for exercising a peremptory challenge
is pretextual and, thus, constitutionally infirm." *State* v. *Holmes*, supra, 176
Conn. App. 178–79.

State *v.* Holmes

ingly, the Appellate Court "conclude[d] that the court [correctly] determined that the [prosecutor's] use of [a] peremptory challenge to exclude W.T. from the jury was not tainted by purposeful racial discrimination, and, therefore, it properly denied the defendant's *Batson* challenge."[11] Id., 182. The Appellate Court unanimously affirmed the judgment of conviction.[12] Id., 192.

[11] The Appellate Court was by no means insensitive to the concerns raised by the defendant. In a footnote, the Appellate Court cited "studies conducted by reputable research firms" and observed that "permitting the use of peremptory challenges with respect to potential jurors who express negative views toward the police or the justice system may well result in a disproportionate exclusion of minorities from our juries, a deeply troubling result." *State* v. *Holmes*, supra, 176 Conn. App. 180–81 n.5. The Appellate Court also expressed its concern about the effect of implicit bias in decisionmaking, observing that it was making "this point not to suggest that the prosecutor conducting voir dire in this case was motivated by racial bias, but to recognize the need to be particularly vigilant in assessing a prosecutor's use of peremptory challenges, especially if the proffered explanation may have a disproportionate impact on minority participation on juries." Id., 181 n.5. Ultimately, the Appellate Court observed that, as "an intermediate state appellate court, we are, of course, bound by extensive precedent that limits our ability to remedy the weaknesses inherent in the *Batson* standard. Our cases are clear that disparate impact alone is insufficient to demonstrate a *Batson* violation. Accordingly, as [this court] did in *State* v. *Hinton*, supra, 227 Conn. 330, we are confined to reminding trial courts to be particularly diligent in assessing the use of peremptory challenges in circumstances that, if left unscrutinized for pretext, may result in 'an unconstitutionally disparate impact on certain racial groups.' " *State* v. *Holmes*, supra, 181–82 n.5.

[12] Judge Lavine issued a scholarly and insightful concurring opinion, agreeing with the Appellate Court majority's conclusion that, "in the present case, the peremptory challenge was properly exercised under prevailing law and practices" but opining that "this case brings into sharp relief a serious flaw in the way *Batson* has been, and can be, applied. *Batson* is designed to prevent lawyers from peremptorily challenging prospective jurors for manifestly improper reasons based on race, national origin, and the like. It was *not* designed to permit prosecutors—and other lawyers—to challenge members of suspect classes solely because they hold widely shared beliefs within the prospective juror's community that are based on life experiences." (Emphasis in original.) *State* v. *Holmes*, supra, 176 Conn. App. 192. Judge Lavine argued that this "blatant flaw that significantly disadvantages black defendants—and people belonging to other suspect classes—has become part of the *Batson* process itself" and urged reform of Connecticut's "jury selection process to eliminate the perverse way in which *Batson* has come to be used." (Footnote omitted.) Id., 193.

Judge Lavine conducted a thorough review of case law and commentary cataloging *Batson*'s shortcomings, including that it requires the court to find that a prosecutor committed serious ethical violations; id., 196–97 and n.4; and that, "as it has evolved, [*Batson* has come to permit] the elimination

State *v.* Holmes

This certified appeal followed. See footnote 2 of this opinion.

## I

## WHETHER FEAR OR DISTRUST OF LAW ENFORCEMENT IS A RACE NEUTRAL REASON FOR A PEREMPTORY CHALLENGE UNDER *BATSON*

On appeal, the defendant urges us to modify or over-rule *State* v. *King*, supra, 249 Conn. 645, and hold that fear or distrust of law enforcement is not a race neutral reason for the use of a peremptory challenge "[b]ecause

of certain categories of prospective jurors whose views are reasonable and widely shared in their communities. The potential for the kind of categorical exclusion that *Batson* permits is simply unacceptable in a system that strives to treat everyone equally. It sends a troubling message to members of minority communities who should be encouraged—not discouraged—to actively engage in, and trust, the criminal justice system.

"[Additionally], permitting a peremptory challenge to be used under these circumstances is an affront to the dignity of the individual prospective juror who is excluded for honestly voicing reasonable and widely held views. It minimizes or negates his or her life experience in an insulting and degrading way. It must be remembered that one of the rationales for *Batson* is that the inappropriate exclusion of prospective jurors deprives the *prospective juror* of his or her constitutional right to serve on a jury—a basic right of citizenship. . . . To prohibit a significant percentage of people belonging to a suspect class from serving on a jury because they express a reasonable, [fact based], and widely held view cannot be countenanced." (Citation omitted; emphasis in original.) Id., 198.

Acknowledging "that peremptory challenges play an important function in our system because they permit lawyers to use their intuition in the very human jury selection process"; id., 199–200; Judge Lavine urged further study of this problem and also proposed an alteration to the *Batson* framework "in Connecticut to ameliorate the negative effects of the present regime." Id., 201. Specifically, Judge Lavine proposed reallocating some of the discretion in the jury selection process from the lawyers to the trial judge and granting "judges . . . the discretion to disallow the use of peremptory challenges in cases in which (1) the prospective juror is part of a suspect class; (2) the prospective juror gives an unequivocal assurance, under oath, that he or she can be fair to both sides; (3) the prospective juror expresses reasonable and [fact based] views, which, in the opinion of the judge, following argument by the lawyers, are widely shared in the prospective juror's particular community; and (4) the judge concludes that the prospective juror can, in fact, be fair." Id.

State *v.* Holmes

it is most commonly minority races that possess such a fear . . . .'' The defendant emphasizes that W.T.'s "general concerns for his safety and equality as an African-American,'' on which the prosecutor relied as a race neutral explanation, are neither "unique to W.T. as an individual nor . . . a direct reflection of his personal experiences but, rather, a well understood reality to the majority of African-Americans. As a result, if the explanation provided by the [prosecutor] for [his] challenge of W.T. is to be considered by the courts as race neutral, it could be used as a reason for excluding a [large number] of potential African-American venirepersons. It would be difficult to maintain acceptance of this reason as race neutral . . . .'' The defendant relies on the authorities cited in Judge Lavine's concurring opinion in the Appellate Court; see footnote 12 of this opinion; and emphasizes the need for courts to be vigilant in guarding against racial discrimination in jury selection given the effects of implicit bias, disparate impact, and the relative ease by which a prosecutor can proffer a racially neutral explanation in defense of a *Batson* challenge. The defendant further argues that "[a]ny implicit racial bias housed by the [prosecutor] in this case was certainly inflated by his knowledge of W.T.'s employment, which he could have perceived, when considered alongside knowledge of W.T.'s race, to be a sign of W.T.'s 'negative' opinions of law enforcement.''

In response, the state relies on *Hernandez* v. *New York*, 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991), *State* v. *Gould*, 322 Conn. 519, 142 A.3d 253 (2016), and *State* v. *Edwards*, supra, 314 Conn. 465, to contend that the Appellate Court properly upheld the trial court's rejection of the *Batson* challenge because disparate impact and unconscious bias claims are not cognizable under the second step of the *Batson* analysis; instead, "discriminatory intent or purpose . . . is

State *v.* Holmes

discerned under the third step of *Batson* based [on] 'an assessment of all the circumstances' and not simply on the basis of disparate impact alone.'' Relying on *State* v. *Hodge*, supra, 248 Conn. 231, and *State* v. *Smith*, 222 Conn. 1, 13–15, 608 A.2d 63 (1992), among other cases, the state also argues that fear or distrust of the police is a race neutral explanation as a matter of law because it is a viewpoint that may be shared by whites and minorities alike. The state further argues that this is not an appropriate case in which to overrule or modify *King* because the record demonstrates that the prosecutor's questioning of all members of the venire was uniform, and, of the at least four African-American members of the venire, W.T. was the only one who expressed a negative view of the police and the only one removed.[13] We agree with the state and conclude that the Appellate Court properly upheld the trial court's rejection of the defendant's *Batson* challenge.

The framework under which we consider *Batson* claims is comprehensively set forth in *State* v. *Edwards*, supra, 314 Conn. 465. ''Voir dire plays a critical function in assuring the criminal defendant that his [or her] [s]ixth [a]mendment right to an impartial jury will be honored. . . . Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. . . . Our constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine [his or her] fitness to serve on the jury. . . . Because the purpose of voir dire is to discover if there is any likelihood that some prejudice is

---

[13] The state also observes that the prosecutor had proffered other race neutral reasons—unchallenged by the defendant on appeal—for the peremptory challenge of W.T., including his concerns about racial disparities in sentencing, his work to rehabilitate prisoners, and the fact that he had close relatives who had been convicted and incarcerated.

State *v.* Holmes

in the [prospective] juror's mind [that] will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted [to ask] questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. . . . The purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause. . . .

"Peremptory challenges are deeply rooted in our nation's jurisprudence and serve as one [state created] means to the constitutional end of an impartial jury and a fair trial. . . . [S]uch challenges generally may be based on subjective as well as objective criteria . . . . Nevertheless, [i]n *Batson* [v. *Kentucky*, supra, 476 U.S. 79] . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the [e]qual [p]rotection [c]lause forbids [a party] to challenge potential jurors solely on account of their race . . . .[14]

"Under Connecticut law, a *Batson* inquiry involves three steps.[15] First, a party must assert a *Batson* claim

---

[14] In addition to race, it is well established that *Batson* also precludes peremptory challenges that discriminate purposefully on the basis of gender, religious affiliation, and ancestry or national origin. See, e.g., *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994) (gender); *State* v. *Rigual*, 256 Conn. 1, 10, 771 A.2d 939 (2001) (ancestry/ national origin); *State* v. *Hodge*, supra, 248 Conn. 240 (religious affiliation).

[15] "We note that a *Batson* inquiry under Connecticut law is different from most federal and state *Batson* inquiries. Under federal law, a three step procedure is followed when a *Batson* violation is claimed: (1) the party

State *v.* Holmes

. . . . [Second] the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the [e]qual [p]rotection [c]lause as a matter of law. . . . At this stage, the court does not evaluate the persuasiveness or plausibility of the proffered explanation but, rather, determines only its facial validity—that is, whether the reason on its face, is based on something other than the race of the juror. . . . Thus, even if the [s]tate produces only a frivolous or utterly nonsensical justification for its strike, the case does not end—it merely proceeds to step three. . . .

"In the third step, the burden shifts to the party asserting the *Batson* objection to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . In evaluating pretext, the court must assess the persuasiveness of the proffered explanation and whether the party exercising the challenge was, in fact, motivated by race. . . . Thus, although an improbable explanation might pass muster under the second step, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination at the third stage of the inquiry. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson

objecting to the exercise of the peremptory challenge must establish a prima facie case of discrimination; (2) the party exercising the challenge then must offer a neutral explanation for its use; and (3) the party opposing the peremptory challenge must prove that the challenge was the product of purposeful discrimination. . . . Pursuant to this court's supervisory authority over the administration of justice, we have eliminated the requirement, contained in the first step of this process, that the party objecting to the exercise of the peremptory challenge establish a prima facie case of discrimination." (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 314 Conn. 484 n.16; see *State* v. *Holloway*, 209 Conn. 636, 646 and n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

State *v.* Holmes

through a peremptory challenge was . . . motivated [by race]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race . . . were asked a question to elicit a particular response that was not asked of other jurors . . . (4) persons with the same or similar characteristics but not the same race . . . as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race . . . .

"In deciding the ultimate issue of discriminatory intent, the [court] is entitled to assess each explanation in light of all the other evidence relevant to [a party's] intent. The [court] may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . . Ultimately, the party asserting the *Batson* claim carries the . . . burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination." (Citations omitted; footnote added; footnote altered; internal quotation marks omitted.) *State* v. *Edwards*, supra, 314 Conn. 483–86; see also Conn. Const., art. I, § 19, as amended by art. IV of the amendments to the constitution; General Statutes § 54-82f; Practice Book § 42-12.

State *v.* Holmes

With respect to appellate review of *Batson* claims, the "second step of the *Batson* inquiry involves a determination of whether the party's proffered explanation is facially race neutral and, thus, is a question of law. . . . Because this inquiry involves a matter of law, we exercise plenary review." (Citations omitted.) *State* v. *Edwards*, supra, 314 Conn. 487.

"The third *Batson* step, however, requires the court to determine if the prosecutor's proffered race neutral explanation is pretextual. . . . Deference [to the trial court's findings of credibility] is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations. . . . Whether pretext exists is a factual question, and, therefore, we shall not disturb the trial court's finding unless it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) Id., 489–90.

We understand the defendant's claims in this case, as clarified at oral argument before this court, to be limited to the second step of *Batson*, namely, to contend that fear or distrust of the police is not a race neutral reason for the exclusion of jurors as a matter of federal constitutional law[16] given its disparate effect on minority jurors. The defendant acknowledges that this argument requires us to overrule, or at the very least strictly limit, a line of Connecticut cases. See, e.g., *State* v. *King*, supra, 249 Conn. 666 (concluding that prosecutor's reasons for striking juror were "not motivated by discriminatory considerations" because "it was reason-

_____

[16] Our analysis is limited to the federal constitution because, as the defendant acknowledged at oral argument before this court, he has not briefed an independent state constitutional claim pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). See, e.g., *State* v. *Saturno*, 322 Conn. 80, 113 n.27, 139 A.3d 629 (2016); see also *State* v. *Hinton*, supra, 227 Conn. 329–31 (rejecting *Batson* claim under state constitution on basis of disparate impact on jurors who reside in vicinity of crime scene at issue).

State *v.* Holmes

able for the prosecutor to conclude that [the juror's] concerns about the fairness of the criminal justice system might make it difficult for him to view the state's case with complete objectivity'' and that rejection of juror's ''employment applications [by] two law enforcement agencies . . . gave rise to a legitimate concern that he might harbor some resentment toward the police and the prosecuting authorities''); *State* v. *Hodge*, supra, 248 Conn. 231 (''[The prospective juror] testified that her son, brother and cousin each had a prior arrest record and that her son had been prosecuted by the New Haven office of the state's attorney, the same office involved in prosecuting the present case. In addition, [she] characterized her cousin's treatment at the hands of the prosecutor who handled his case as unfair.''); *State* v. *Smith*, supra, 222 Conn. 14 (concluding that exclusion of juror with arrest record was racially neutral because ''[p]rosecutors commonly seek to exclude from juries all individuals, whatever their race, who have had negative encounters with the police because they fear that such people will be biased against the government''); *State* v. *Jackson*, 73 Conn. App. 338, 350– 51, 808 A.2d 388 (rejecting *Batson* challenge to peremptory strike of African-American juror who ''had some relatives that had some general contact with New Haven police officers and had been involved in narcotics, and [whose] relatives have been in court,'' because defendant's *Batson* argument ''rested solely on the disproportionate impact that the race neutral explanations the state provided could have on inner-city black males,'' and ''[p]roof of racially discriminatory intent or purpose is required to show a violation of the [e]qual [p]rotection [c]lause'' [internal quotation marks omitted]), cert. denied, 262 Conn. 929, 814 A.2d 381 (2002), and cert. denied, 262 Conn. 930, 814 A.2d 381 (2002); *State* v. *Morales*, 71 Conn. App. 790, 807, 804 A.2d 902 (concluding that prospective juror's ''negative opinion concern-

State *v.* Holmes

ing police performance, especially with respect to drug related crime,'' was ''a valid, nondiscriminatory reason'' for excusing him given ''the state's considerable dependency on police testimony . . . and the fact that the crime charged was drug related,'' and prosecutor was not bound to accept his statement that ''he would not allow those considerations to affect his impartiality as a juror''), cert. denied, 262 Conn. 902, 810 A.2d 270 (2002); see also *State* v. *Hinton*, supra, 227 Conn. 327– 28 (prospective juror's stated ''sympathy to African-Americans whom she perceived were treated unfairly by the criminal justice system,'' as well as her exposure to pretrial media publicity and fact that she lived near crime scene, were legitimate race neutral reasons for her exclusion and not pretextual).

The defendant's disparate impact argument is foreclosed as a matter of federal constitutional law by the United States Supreme Court's decision in *Hernandez* v. *New York*, supra, 500 U.S. 352. In *Hernandez*, the United States Supreme Court concluded that a prosecutor had not violated *Batson* by using peremptory challenges to exclude Latino jurors by reason of their ethnicity when he offered as a race neutral explanation his concern that bilingual jurors might have difficulty accepting the court interpreter's official translation of multiple witnesses' testimony given in Spanish. Id., 357– 58. In so concluding, the Supreme Court rejected the argument that the prosecutor's reasons, if assumed to be true, were not race neutral and thus violated the equal protection clause as a matter of law because of their disproportionate impact on Latino jurors. See id., 362–63. The court relied on ''the fundamental principle that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the [e]qual [p]rotection [c]lause. . . . Discriminatory purpose

State *v.* Holmes

. . . implies more than intent as volition or intent as awareness of consequences. It implies that the [decision maker] . . . selected . . . a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'' (Citations omitted; internal quotation marks omitted.) Id., 359–60, quoting *Personnel Administrator* v. *Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979), and *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977). The Supreme Court stated that a ''neutral explanation in the context of [its] analysis . . . means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'' *Hernandez* v. *New York*, supra, 360. Noting that the prosecutor also had relied on the prospective jurors' demeanor and his assessment of their willingness to accept the official translation relative to other bilingual jurors, the court observed that ''[e]ach category would include both Latinos and non-Latinos. While the prosecutor's criterion might well result in the disproportionate removal of prospective Latino jurors, that disproportionate impact does not turn the prosecutor's actions into a per se violation of the [e]qual [p]rotection [c]lause.'' Id., 361.

The Supreme Court emphasized, however, that disparate impact is not completely irrelevant under *Batson*. Instead, ''disparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent, but it will not be conclusive in the preliminary [race neutrality] step of the *Batson* inquiry. An argument relating to the impact of a classification does not alone show its purpose. . . . Equal protection analysis turns on the intended consequences

State *v.* Holmes

of government classifications. Unless the government actor adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principle of race neutrality. Nothing in the prosecutor's explanation shows that he chose to exclude jurors who hesitated in answering questions about following the interpreter *because* he wanted to prevent bilingual Latinos from serving on the jury.'' (Citation omitted; emphasis in original.) Id., 362. After analyzing the record under the third step of *Batson*, the Supreme Court concluded that the reason was not a pretext for intentional discrimination, deferring to the state trial judge's factual finding that the prosecutor had not used that reason as a pretext for intentional discrimination. Id., 363–64.

We have relied on *Hernandez* on multiple occasions to reject claims that a prosecutor's explanation was not race neutral as a matter of law under the second step of *Batson* because of its claimed disparate impact on minority groups. Most recently, in *State* v. *Edwards*, supra, 314 Conn. 465, we rejected a defendant's claim that a prospective juror's racial self-identification on the juror questionnaire as "human," which the prosecutor offered as a race neutral explanation in response to the defendant's *Batson* challenge, is "a proxy for race, and, thus, the court should find discriminatory intent inherent in the prosecutor's explanation"; id., 490; because "a racial minority is more likely to identify himself or herself as an 'unusual' race, and, thus, the prosecutor's proffered reason is inherently discriminatory. This argument is, in essence, a disparate impact argument, which is not dispositive of the issue of race neutrality." Id., 492. Turning to the third step of *Batson*, we considered disparate impact as a possible indicator of pretext, but we ultimately determined that there was "insufficient evidence to find any sort of disparate impact from the prosecutor's proffered explanation," given that the social science studies proffered by the defendant proved "only that racial minorities are more likely to

State *v.* Holmes

self-identify in creative and unusual ways, not that these same individuals would write an unusual answer in an official document. Furthermore, the prosecutor's proffered explanation related to unusual answers in the questionnaire generally, not to the race line specifically.'' Id., 496–97; see id., 497 (noting that ''a policy of excluding all individuals who provide an answer other than the usual answer to the question of race, i.e., 'Caucasian,' 'African-American,' or other [well known] races, 'without regard to the particular circumstances of the trial or the individual responses of the [potential] jurors, may be found by the trial [court] to be a pretext for racial discrimination' ''). In *State* v. *Hinton*, supra, 227 Conn. 329–31, this court rejected a state constitutional challenge based on the disparate racial impact of prospective jurors' residency near the crime scene, but we expressed caution about the possible pretextual effect of this explanation should it be left ''unscrutinized'' by the trial court. Cf. *State* v. *Gould*, supra, 322 Conn. 533–34 (erroneous removal of juror for cause based on judge's misperception of his English language competency did not require automatic reversal under *Batson* because there was no claim of purposeful discrimination, and ''the specter of implied or unconscious bias . . . finds no support in *Batson* or its progeny'').

Given the breadth of the United States Supreme Court's decision in *Hernandez*, it is not surprising that the defendant has not cited any case law for the proposition that distrust of law enforcement or the criminal justice system is not a race neutral reason under *Batson* for exercising a peremptory challenge on a juror.[17] Indeed, the only post-*Hernandez* cases we have located

___

[17] Examples abound of courts accepting distrust of the criminal justice system or law enforcement officers as a race neutral explanation for peremptorily challenging a juror. See, e.g., *United States* v. *Alvarez-Ulloa*, 784 F.3d 558, 567 (9th Cir. 2015); *United States* v. *Moore*, 651 F.3d 30, 43 (D.C. Cir. 2011), aff'd sub nom. *Smith* v. *United States*, 568 U.S. 106, 133 S. Ct. 714, 184 L. Ed. 2d 570 (2013); *People* v. *Hardy*, 5 Cal. 5th 56, 81, 418 P.3d 309, 233 Cal. Rptr. 3d 378 (2018), cert. denied,      U.S.    , 139 S. Ct. 917, 202 L.

State *v.* Holmes

on this direct point have expressly rejected this dispa-
rate impact argument. For example, the United States
Court of Appeals for the Seventh Circuit recently
rejected an argument that "the government's proffered
justification for the strike—bias against law enforce-
ment—is not [race neutral] because [African-Ameri-
cans] are disproportionately affected by negative
interactions with law enforcement. Even accepting the
premise of this argument, it does not support a finding
of pretext. *Batson* protects against intentional discrimi-
nation, not disparate impact. . . . Moreover, we have
acknowledged that bias against law enforcement is a
legitimate [race neutral] justification." (Citation omit-
ted.) *United States* v. *Brown*, 809 F.3d 371, 375–76 (7th
Cir.), cert. denied, U.S. , 136 S. Ct. 2034, 195 L.
Ed. 2d 219 (2016); see *United States* v. *Arnold*, 835
F.3d 833, 842 (8th Cir. 2016) (rejecting argument that
prosecutor's reliance on prospective jurors' "[exhibi-
tion of] strong agreement with the suggestion that
police could be wrong" was "by itself . . . illegitimate
and discriminatory because distrust of police officers
is prevalent among [African-Americans]"). Similarly, in
*State* v. *Rollins*, 321 S.W.3d 353 (Mo. App. 2010), trans-
fer denied, Missouri Supreme Court, Docket No.
SC91170 (October 26, 2010), cert. denied, 563 U.S. 946,
131 S. Ct. 2115, 179 L. Ed. 2d 910 (2011), the court
rejected an argument under the second step of *Batson*,
founded on an African-American prospective juror's
negative perception of police officers, that "the court
was required to take into account the disparate impact
of such a supposedly facially [race neutral] reason when
it means that members of a particular race or ethnicity
are more likely to be affected than others" because
"disparate impact does not conclusively govern in the

Ed. 2d 648 (2019); *State* v. *Mootz*, 808 N.W.2d 207, 219 (Iowa 2012); *Batiste*
v. *State*, 121 So. 3d 808, 849 (Miss. 2013), cert. denied, 572 U.S. 1117, 134
S. Ct. 2287, 189 L. Ed. 2d 178 (2014); *State* v. *Nave*, 284 Neb. 477, 487–88,
821 N.W.2d 723 (2012), cert. denied, 568 U.S. 1236, 133 S. Ct. 1595, 185 L.
Ed. 2d 591 (2013).

State *v.* Holmes

preliminary [race neutrality] step of the *Batson* inquiry.''
Id., 366; cf. *State* v. *Veal*, 930 N.W.2d 319, 334 (Iowa
2019) (declining to adopt ''something like a cause
requirement'' with respect to use of strike of last Afri-
can-American juror, despite ''aware[ness] of the dispro-
portionate impact when jurors can be removed based
on prior interactions with law enforcement,'' because
''this case involved a special set of circumstances—a
prosecutor's use of a peremptory strike on a juror
because the same prosecutor had sent her father to
prison for the rest of his life''). Thus, with no adequate
claim that the Appellate Court improperly upheld the
trial court's finding that the prosecutor's reasons were
not pretextual under the third step of *Batson*,[18] we con-
clude that the Appellate Court properly affirmed the
judgment of conviction.

[18] The state observes that the ''Appellate Court majority was unable to
ascertain whether the defendant was challenging the trial court's resolution
of both the second and third steps of *Batson*, or whether he was challenging
only the court's ultimate factual finding that the prosecutor did not act with
discriminatory intent in exercising the peremptory challenge against W.T.''
See *State* v. *Holmes*, supra, 176 Conn. App. 175. We read the defendant's
brief to this court to limit his challenge to the second step of *Batson*, insofar
as he does not engage in any significant analysis of the record to demonstrate
that the trial court's finding of no pretext was clearly erroneous and instead
emphasizes that the prosecutor's reasons with respect to '' 'negative' '' inter-
actions with law enforcement were not racially neutral ''per se'' because
they ''have a strong air of implicit racial bias, particularly with the knowledge
that potential juror W.T. is of African-American descent,'' and ''minority
races are generally afraid of [the] police, a statistical conclusion that is not
shocking given the amount of violence against minorities inundating recent
headlines.'' This reading was borne out at oral argument before this court,
at which counsel for the defendant candidly acknowledged that the trial
prosecutor had *not acted purposefully* to exclude African-Americans or
other minorities from the jury but instead had elected to question prospective
jurors about a topic that would have the effect of excluding minority jurors,
rendering it not race neutral as a matter of law.
　The defendant argues, however, that, ''based on what is known about the
human inability to recognize biases and the tendency to readily provide a
race neutral reason for [one's] behavior, it is easy to assume that the [prose-
cutor] in this case acted in accordance with his implicit racial biases in
exercising a peremptory challenge against W.T., and that the trial court did
not exercise sufficient prudence in making a determination as to the propri-

State *v.* Holmes

## II

## *BATSON* REFORM IN CONNECTICUT

Although the relief that we can provide in this case is constrained by the defendant's decision to limit his *Batson* claims to the equal protection clause of the United States constitution; see footnote 16 of this opinion; the broader themes of disparate impact and implicit bias that the defendant advances raise, as the state candidly acknowledges, extremely serious concerns with respect to the public perception and fairness of the criminal justice system.[19] As the United States Supreme

ety of the challenge. Had the court . . . been more aware of the likelihood of implicit racial biases to be hidden by race neutral reasons offered by the party exercising a challenge against a potential juror, [the court] would have found pretext as it related to the [prosecutor's] proffered reasons for challenging potential juror W.T., *particularly in a situation where the [court itself] found W.T. to be impartial.*" (Emphasis added.) We disagree with this characterization of the record, insofar as the defendant has not identified, and our independent review has not revealed, a specific finding that W.T. was in fact impartial. In any event, this argument—founded on implicit bias—falls short of the purposeful discrimination contemplated by *Batson.* See, e.g., *State* v. *Gould*, supra, 322 Conn. 533–34.

Finally, to the extent that the defendant does argue pretext, he relies on the decision of the United States Court of Appeals for the Second Circuit in *Mullins* v. *Bennett*, 228 Fed. Appx. 55, 56 (2d Cir.), cert. denied sub nom. *Mullins* v. *Bradt*, 552 U.S. 911, 128 S. Ct. 259, 169 L. Ed. 2d 190 (2007), to contend that the prosecutor's challenge to W.T. based on his employment as a social worker was a pretext for racial discrimination because "the central issue being contested in this case does not at all relate to social work or troubled families . . . ." We disagree, insofar as the prosecutor relied on W.T.'s volunteer work with incarcerated persons, not his social work employment as a general matter.

[19] To its great credit, the state acknowledges the importance of "understanding and appreciating the existence and potentially corrupting influence of implicit or unconscious biases" and notes that "Connecticut prosecutors regularly receive training on this subject for the purpose of gaining insight regarding this phenomenon and eliminating its corrupting influences to the full[est] extent possible." See A. Burke, "Prosecutors and Peremptories," 97 Iowa L. Rev. 1467, 1483–85 and n.93 (2012) (urging prosecutors to consider their institutional ethical obligation and to undertake "voluntary reforms designed to bolster the prosecutor's role in protecting [race neutral] jury selection and to neutralize the biases that might lead to racialized peremptory challenges," including implicit bias training and " 'switching' exercises during voir dire to assess for disparate questioning or reasoning").

State *v.* Holmes

Court recently observed, "[o]ther than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process." *Flowers* v. *Mississippi*, U.S. , 139 S. Ct. 2228, 2238, 204 L. Ed. 2d 638 (2019). Moreover, there is great "constitutional value in having diverse juries," insofar as "equally fundamental to our democracy is that all citizens have the opportunity to participate in the organs of government, including the jury. If we allow the systematic removal of minority jurors, we create a badge of inferiority, cheapening the value of the jury verdict. And it is also fundamental that the defendant who looks at the jurors sitting in the box have good reason to believe that the jurors will judge as impartially and fairly as possible. Our democratic system cannot tolerate any less." *State* v. *Saintcalle*, 178 Wn. 2d 34, 49–50, 309 P.3d 326 (overruled in part on other grounds by *Seattle* v. *Erickson*, 188 Wn. 2d 721, 398 P.3d 1124 [2017]), cert. denied, 571 U.S. 1113, 134 S. Ct. 831, 187 L. Ed. 2d 691 (2013). "From a practical standpoint, studies suggest that compared to diverse juries, [all white] juries tend to spend less time deliberating, make more errors, and consider fewer perspectives. . . . In contrast, diverse juries were significantly more able to assess reliability and credibility, avoid presumptions of guilt, and fairly judge a criminally accused. . . . By every deliberation measure . . . heterogeneous groups outperformed homogeneous groups. . . . These studies confirm what seems obvious from reflection: more diverse juries result in fairer trials." (Citations omitted; internal quotation marks omitted.) Id., 50; see, e.g., J. Rand, "The Demeanor Gap: Race, Lie Detection, and the Jury," 33 Conn. L. Rev. 1, 60–61 (2000) (suggesting that jury diversity is necessary to address "[d]emeanor [g]ap," which undermines accuracy of cross-racial credibility determinations). Insofar as *Batson* has been roundly criticized for its doctrinal

State *v.* Holmes

and practical shortcomings in preventing both purpose-
ful and unconscious racial discrimination, this appeal
presents us with an occasion to consider whether fur-
ther action on our part is necessary to promote public
confidence in the perception of our state's judicial sys-
tem with respect to fairness to both litigants and their
fellow citizens.

A

Review of *Batson* Problems and Solutions

Reams of paper have been consumed by judicial opin-
ions and law review articles identifying why *Batson*
has been a toothless tiger when it comes to combating
racially motivated jury selection, and numerous authori-
ties and commentators have proposed various solutions
to those specific problems. Much of *Batson*'s perceived
ineffectiveness stems from its requirement of purpose-
ful discrimination. To begin with, the pretext and pur-
poseful discrimination aspects of *Batson*'s third step
require the trial judge to make the highly unpalatable
finding that the striking attorney has acted unethically
by misleading the court and intentionally violating a
juror's constitutional rights. See, e.g., *State* v. *Veal*,
supra, 930 N.W.2d 360 (Appel, J., concurring in part and
dissenting in part) ("requiring a district court judge to,
in effect, charge the local prosecutor with lying and
racial motivation from the bench in the course of voir
dire is unrealistic"); *State* v. *Saintcalle*, supra, 178 Wn.
2d 53 ("[i]magine how difficult it must be for a judge
to look a member of the bar in the eye and level an
accusation of deceit or racism"); J. Bellin & J. Semitsu,
"Widening *Batson*'s Net To Ensnare More Than the
Unapologetically Bigoted or Painfully Unimaginative
Attorney," 96 Cornell L. Rev. 1075, 1113 (2011) ("so
long as a personally and professionally damning finding
of attorney misconduct remains a prerequisite to award-
ing relief under *Batson*, trial courts will be understand-

State *v.* Holmes

ably reluctant to find *Batson* violations''); M. Bennett, ''Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of *Batson*, and Proposed Solutions,'' 4 Harv. L. & Policy Rev. 149, 162–63 (2010) (noting dual difficulties that ''[m]ost trial court judges will . . . find such deceit [only] in extreme situations,'' while other troubling cases indicated that ''some prosecutors are explicitly trained to subvert *Batson*''); R. Charlow, ''Tolerating Deception and Discrimination After *Batson*,'' 50 Stan. L. Rev. 9, 63–64 (1997) (''[S]hould courts apply *Batson* vigorously, it would be even less appropriate to sanction personally those implicated. Moreover, judges may be hesitant to find *Batson* violations, especially in close cases, if doing so means that attorneys they know and see regularly will be punished personally or professionally as a result.''); T. Tetlow, ''Solving *Batson*,'' 56 Wm. & Mary L. Rev. 1859, 1897–98 (2015) (''[The *Batson* rule's focus on pretext] requires personally insulting prosecutors and defense lawyers in a way that judges do not take lightly, calling them liars and implying that they are racist. Technically, as some have argued, lying to the court constitutes an ethics violation that the judge should then report to the bar for disciplinary proceedings. Disconnecting the regulation of jury selection from the motives of lawyers will make judges far more likely to enforce the rule.'' [Footnotes omitted.]).

Second, the purposeful discrimination requirement does nothing to address the adverse effects of implicit or unconscious bias on jury selection. As the Washington Supreme Court has astutely observed: ''In part, the problem is that racism itself has changed. It is now socially unacceptable to be overtly racist. Yet we all live our lives with stereotypes that are ingrained and often unconscious, implicit biases that endure despite our best efforts to eliminate them. Racism now lives not in the open but beneath the surface—in our insti-

State *v.* Holmes

tutions and our subconscious thought processes—because we suppress it and because we create it anew through cognitive processes that have nothing to do with racial animus.'' (Footnote omitted.) *State* v. *Saint-calle*, supra, 178 Wn. 2d 46; see also T. Tetlow, supra, 56 Wm. & Mary L. Rev. 1946 (''The current *Batson* rule constitutes a placebo that purports to solve the problem of discrimination by juries but really focuses only on purported discrimination against jurors. Not only does it fail to address the real issues, it also actively distracts from them. The *Batson* rule represents the culmination of the [United States] Supreme Court's desire to solve the intractable and unconscionable problem of racism in our criminal justice system by ordering everyone in the courtroom to ignore it.'').

In a leading article on implicit bias, Professor Antony Page makes the following observation with respect to a lawyer's own explanations for striking a juror peremptorily: ''[W]hat if the lawyer is wrong? What if her awareness of her mental processes is imperfect? What if she does not know, or even cannot know, that, in fact, but for the juror's race or gender, she would not have exercised the challenge?'' (Emphasis omitted.) A. Page, ''*Batson*'s Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge,'' 85 B.U. L. Rev. 155, 156 (2005). ''The attorney is both honest and discriminating on the basis of race or gender. Such unconscious discrimination occurs, almost inevitably, because of normal cognitive processes that form stereotypes.'' (Emphasis omitted.) Id., 180. Professor Page's landmark article ''examines the findings from recent psychological research to conclude that the lawyer often will be wrong, will be unaware of her mental processes, and would not have exercised the challenge but for the juror's race or gender. As a result (and not because of lying lawyers), the *Batson* peremptory challenge framework is woefully ill-suited to address the problem of

State *v.* Holmes

race and gender discrimination in jury selection.''
(Emphasis omitted.) Id., 156.

The studies reviewed by Professor Page demonstrate
that ''few attorneys will always be able to correctly
identify the factor that caused them to strike or not
strike a particular potential juror. The prosecutor may
have actually struck on the basis of race or gender, but
she plausibly believes she was actually striking on the
basis of a [race neutral] or [gender] neutral factor.
Because a judge is unlikely to find pretext, the peremp-
tory challenge will have ultimately denied potential
jurors their equal protection rights.'' (Footnote omit-
ted.) Id., 235. Although Professor Page argues that the
social psychology research supports addressing implicit
bias by eliminating peremptory challenges entirely; id.,
261; in the alternative, he proposes (1) to eliminate the
*Batson* procedure's requirement of subjective discrim-
inatory intent, which also relieves judges of ''mak[ing]
the difficult finding that the lawyers before them are
dishonest,'' (2) to instruct jurors about the concepts
of unconscious bias and stereotyping, (3) to require
educating attorneys about unconscious bias, with a
requirement that they ''actively and vocally affirm their
commitment to egalitarian [nondiscriminatory] princi-
ples,'' and (4) to increase the use of race blind and
gender blind questionnaires. Id., 260–61.

Similarly, Judge Mark W. Bennett, an experienced
federal district judge, considers the ''standards for fer-
reting out lawyers' potential explicit and implicit bias
during jury selection . . . a shameful sham''; he, too,
urges (1) the inclusion of jury instructions and presen-
tations during jury selection on the topic of implicit
bias, to adequately explore a juror's impartiality, and (2)
the administration of implicit bias testing to prospective
jurors. M. Bennett, supra, 4 Harv. L. & Policy Rev. 169–
70. But see J. Abel, ''*Batson*'s Appellate Appeal and Trial
Tribulations,'' 118 Colum. L. Rev. 713, 762–66 (2018)

(discussing *Batson*'s greater value in direct and collateral postconviction review proceedings, particularly in habeas cases that afford access to evidence beyond trial record to prove discrimination).

The second step of *Batson*, which requires the state to proffer a race neutral explanation for the peremptory challenge, has been criticized as particularly ineffective in addressing issues of disparate impact and implicit bias such as those raised by the defendant in this appeal. Specifically, the United States Supreme Court's decision in *Purkett* v. *Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995), took a very broad approach to the second step, allowing virtually any race neutral explanation, however "implausible or fantastic," to pass muster; the actual merit of the explanation is considered only during the pretext inquiry of the third step. See *State* v. *Edwards*, supra, 314 Conn. 484–85. *Purkett* has been criticized for its effect in "watering down" the *Batson* inquiry. See L. Cavise, "The *Batson* Doctrine: The Supreme Court's Utter Failure To Meet the Challenge of Discrimination in Jury Selection," 1999 Wis. L. Rev. 501, 537. Some courts and commentators have urged reforms to ensure that the reason proffered by the prosecutor relates to the case being tried in an attempt to limit post hoc reasoning for the use of the strike. See *Ex parte Bruner*, 681 So. 2d 173, 173 (Ala. 1996) (rejecting disparate impact conclusion in *Hernandez* v. *New York*, supra, 500 U.S. 352, and *Purkett* as matter of Alabama law); *Spencer* v. *State*, 238 So. 3d 708, 712 (Fla.) (under Florida law, second prong of *Batson* requires prosecutor to identify "clear and reasonably specific" race neutral explanation that is related to trial at hand, which requires trial court to "determine both whether the reason was neutral and reasonable and whether the record supported the absence of pretext" [internal quotation marks omitted]), cert. denied,      U.S.    , 138 S. Ct. 2637, 201 L.

State *v.* Holmes

Ed. 2d 1039 (2018); see also *Tennyson* v. *State*, Docket No. PD-0304-18, 2018 WL 6332331, *7 (Tex. Crim. App. December 5, 2018) (Alcala, J., dissenting from refusal of discretionary review) ("[i]f any implausible or outlandish reason that was never even discussed with a prospective juror can be accepted as a genuine [race neutral] strike by a trial court . . . and if appellate courts simply defer to trial courts . . . then *Batson* is rendered meaningless, and it is time for courts to enact alternatives to the current *Batson* scheme to better effectuate its underlying purpose"). It also has been suggested that the second step of *Batson* be modified to circumscribe the number of permissible race neutral explanations or increase their quality, which would also alleviate the more difficult discrimination finding attendant to the third step. See L. Cavise, supra, 551–52 ("If the Supreme Court is serious when it holds that the venireperson's right to serve is of such importance that it merits equal protection coverage, then surely it is merely a logical extension to prohibit a person from being improperly removed for the [nonreason] of the neutral explanation. Is the exalted right to serve merely a facade to be torn away on the sheerest of explanations? Minorities, women, and persons of cognizable ethnicity should . . . be removed [only] for legitimate reasons—which does not include those that are purely subjective, irrational, or unverifiable, much less racist or sexist."); J. Wrona, Note, "*Hernandez* v. *New York*: Allowing Bias To Continue in the Jury Selection Process," 19 Ohio N.U. L. Rev. 151, 158 (1992) (criticizing *Hernandez* for giving "little value to the disparate impact of the prosecutor's challenges" and "emphasizing the prosecutor's subjective rationale and attaching minor significance to objective evidence," which affords "prosecutors ample means to discriminate in jury selection").

Other commentators have proposed solutions that more directly consider the demographics of the jury in

State *v.* Holmes

considering whether to allow the use of peremptory challenges in a particular case, akin to the approach suggested by Judge Lavine in his concurring opinion in the Appellate Court. See *State* v. *Holmes*, supra, 176 Conn. App. 201–202; see also footnote 12 of this opinion. One proposal is to engage in a qualitative analysis similar to that used to assess a challenge for cause, in which the trial judge would balance claims of potential juror bias against the systemic interest in diversity of the jury.[20] See L. Cavise, supra, 1999 Wis. L. Rev. 551 ("The cost of this approach would be that, in gender and race questioning, the peremptory would be transformed into a challenge for 'quasi-cause.' In other words, trial judges would be required to do with peremptories just as they have been doing with challenges for cause . . . but simply lower the standard for the challenge to allow some exercise of the intuitive. Any judge who can say 'I may not agree but I see how you can think that' has mastered this suggestion in peremptory challenges."); A. Cover, "Hybrid Jury Strikes," 52 Harv. C.R.-C.L. L. Rev. 357, 395 (2017) ("[The author suggests the] replacement of traditional peremptory strikes with hybrid jury strikes, which could . . . be exercised [only] if the proponent first articulated reasons coming close to, but not found to satisfy, the standard for cause challenges. This reform would have important salutary effects by mandating ex ante rationality, yet preserving in modified form the most important penumbral function of the peremptory strike."); T. Tetlow, supra, 56 Wm. & Mary L. Rev. 1895 (proposing test that would balance quality of claims of juror bias against impact on diversity of striking juror, rather than their sincerity); see also

_____

[20] The state, while acknowledging that "*Batson* has been widely criticized as being ineffectual," criticizes such diversity conscious solutions as unconstitutional and discriminatory in their own right insofar as they would affirmatively treat white and minority venirepersons differently. Because neither of these solutions is directly before us for adjudication, we express no view regarding the merits of the state's concerns.

State *v.* Holmes

T. Tetlow, supra, 1900–1906 (arguing that that *Holland* v. *Illinois*, 493 U.S. 474, 482–83, 110 S. Ct. 803. 107 L. Ed. 2d 905 [1990], holding that sixth amendment requirement of fair cross section on venire does not apply to petit jury, was wrongly decided and arguing in favor of consideration of diversity during jury selection, rather than "equat[ing] race consciousness with racism").

Other commentators have suggested that some of the concerns about *Batson* can be addressed procedurally by delaying the final decision of whether to seat a juror or to accept a strike until the conclusion of voir dire, thus allowing a provisionally stricken juror to be reseated should a pattern emerge of apparently discriminatory challenges. See J. Bellin & J. Semitsu, supra, 96 Cornell L. Rev. 1127 (suggesting that if "a trial court can invalidate a peremptory challenge after finding an unrebutted appearance of discrimination, it could be contended that the proposal is insufficiently tethered to *Batson* and, thus, the constitutional right that *Batson* enforces,'' and making prophylactic ''analogy to *Miranda* warnings and the decades of practice that have shown that a robust enforcement of the *Batson* right must of necessity sweep more broadly than the constitutional right itself'' [emphasis omitted]). Our existing *Batson* case law is compatible with this suggestion. See *State* v. *Robinson*, 237 Conn. 238, 252–53 and n.14, 676 A.2d 384 (1996) (holding that "a defendant may object to the state's peremptory challenge on *Batson* equal protection grounds at any time prior to the swearing of the jury" and noting that nothing on face of General Statutes § 51-238a precludes trial judge from recalling juror who was released from duty).

Moving beyond the courtroom itself, other commentators have suggested the reform of recordkeeping practices to allow for the evaluation of jury selection practices on a systemic level. See C. Grosso & B. O'Brien, "A Call to Criminal Courts: Record Rules for

State *v.* Holmes

*Batson*,'' 105 Ky. L.J. 651, 662 (2017) (''Our limited evidence suggests that the regular availability of statistical evidence might mitigate racial disparities in jury selection. If this is true, criminal courts need to recognize their obligation to preserve and provide access to jury selection data for all criminal trials.''); id., 667–68 (suggesting retention of records, including race of potential jurors, whether they served, and ''additional venire characteristics,'' with omission of juror names or other identifying information to protect jurors' privacy and safety); R. Wright et al., ''The Jury Sunshine Project: Jury Selection Data as a Political Issue,'' 2018 U. Ill. L. Rev. 1407, 1442 (advocating for aggregation and collection of jury selection data across court systems to promote public policy advocacy with respect to reduction of discrimination during jury selection process); see also A. Burke, ''Prosecutors and Peremptories,'' 97 Iowa L. Rev. 1467, 1485–86 (2012) (urging prosecutors to ''collect and publish both individual and office-wide data regarding the exercise of peremptory challenges'').

Finally, we cannot ignore the intersection of peremptory challenges with other areas of the law bearing on the composition of our juries, including the fair cross section requirement that we recently considered in *State* v. *Moore*, 334 Conn. 275,     A.3d     (2019), to ensure a diverse jury pool. ''When we approach a case with civil rights implications, it is important to think systemically. Important issues involving the [composition] of the venire pool, the scope of voir dire of potential jurors, the use of peremptory challenges, and the instructions given to the jury intersect and act together to promote, or resist, our efforts to provide all defendants with a fair trial.'' *State* v. *Veal*, supra, 930 N.W.2d 344 (Appel, J., concurring in part and dissenting in part); see id., 360 (Appel, J., concurring in part and dissenting in part) (''*Batson*'s relatively free reign on peremptory challenges cuts rough against the grain of the constitu-

State *v.* Holmes

tional value of achieving juries with fair cross sections of the community. By opening the valve on peremptory challenges, you close the [fair cross section] pipe and lose the benefits of diversity, which are substantial.''); L. Cavise, supra, 1999 Wis. L. Rev. 549 (noting solutions to *Batson*'s shortcomings that ''focus on the selection of the venire, such as supplementing the traditional method of voter registration lists with driver's license or other lists to [ensure] proportionality,'' sending ''jury questionnaires . . . to selected areas with a higher percentage of minorities, and [having] the results of the questionnaires or the composition of the venire actually called to service be scanned by the chief judge to [ensure] diversity'').

B

Implementation of *Batson* Reforms

Although *Batson* has serious shortcomings with respect to addressing the effects of disparate impact and unconscious bias, we decline to ''throw up our hands in despair at what appears to be an intractable problem. Instead, we should recognize the challenge presented by unconscious stereotyping in jury selection and rise to meet it.'' *State* v. *Saintcalle*, supra, 178 Wn. 2d 49. We hesitate to assume, however, that this court is best situated in the first instance to issue an edict prescribing a solution to what ails *Batson* on a systemic level. But see *State* v. *Holloway*, 209 Conn. 636, 646 and n.4, 553 A.2d 166 (using supervisory authority to provide greater protection than required by *Batson* by eliminating requirement under first prong of establishing prima facie case of purposeful discrimination in any case in which venirepersons of same cognizable racial group as defendant are peremptorily struck from venire), cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

State *v.* Holmes

Instead, the scale and variety of the potential changes that appear necessary to address the flaws in *Batson*, as shown by the menu of possible solutions such as those discussed in part II A of this opinion, beg for a more deliberative and engaging approach than appellate adjudication, which is limited to the oral and written advocacy of the parties and stakeholders appearing as amici curiae in a single case. See, e.g., *Johnson* v. *California*, 545 U.S. 162, 168, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005) (recognizing that states "have flexibility in formulating appropriate procedures to comply with *Batson*''); *State* v. *Saintcalle*, supra, 178 Wn. 2d 51 (''[t]he *Batson* framework anticipates that state procedures will vary, explicitly granting states flexibility to fulfill the promise of equal protection''); accord *State* v. *Gould*, supra, 322 Conn. 535–37 (declining to require provision of translator to ''prevent the underrepresentation of minorities on juries due to the English proficiency requirement'' because that argument ''is one that is more appropriately addressed to the legislature rather than this court,'' but noting that ''[o]ur Judicial Branch has been proactive in addressing the issue of limited English proficiency by establishing the Committee on Limited English Proficiency and charging it with 'eliminating barriers to facilities, processes and information that are faced by individuals with limited English proficiency' '').

To this end, we find it most prudent to follow the Washington Supreme Court's approach to this problem in *State* v. *Saintcalle*, supra, 178 Wn. 2d 34, which was to uphold under existing law the trial court's finding that the prosecutor had not acted with purposeful discrimination in exercising a peremptory challenge, but also to take the ''opportunity to examine whether our *Batson* procedures are robust enough to effectively combat race discrimination in the selection of juries''; id., 35; by convening a work group of relevant stakeholders to study the problem and resolve it via the state's

334 Conn. 202 DECEMBER, 2019 247

State *v.* Holmes

rule-making process, which is superintended by that court.[21] Id., 55–56; see *State* v. *Jefferson,* 192 Wn. 2d 225, 243–47, 429 P.3d 467 (2018) (describing work group's process).

The rule-making process[22] that followed *Saintcalle* recently culminated in the Washington Supreme Court's adoption of a comprehensive court rule governing jury selection, Washington General Rule 37,[23] which applies

[21] In referring *Batson* reform to the rule-making process, "[a]s a first step," the Washington court proposed to "abandon and replace *Batson*'s 'purposeful discrimination' requirement with a requirement that necessarily accounts for and alerts trial courts to the problem of unconscious bias, without ambiguity or confusion. For example, it might make sense to require a *Batson* challenge to be sustained if there is a reasonable probability that race was a factor in the exercise of the peremptory challenge or [when] the judge finds it is more likely than not that, but for the defendant's race, the peremptory challenge would not have been exercised. A standard like either of these would take the focus off of the credibility and integrity of the attorneys and ease the accusatory strain of sustaining a *Batson* challenge. This in turn would simplify the task of reducing racial bias in our criminal justice system, both conscious and unconscious." *State* v. *Saintcalle*, supra, 178 Wn. 2d 53–54.

[22] The Final Report of the Jury Selection Workgroup, explaining the proposal adopted by the Washington Supreme Court as General Rule 37, provides a comprehensive "legislative history" of that rule, which resulted from consideration of proposed rules submitted by the American Civil Liberties Union and the Washington Association of Prosecuting Attorneys, with considerable comment by the bench and bar. See Jury Selection Workgroup, Washington Supreme Court, Proposed New GR 37—Jury Selection Workgroup Final Report, p. 1, available at http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/OrderNo25700-A-1221Workgroup.pdf (last visited December 16, 2019).

[23] Rule 37 of the Washington General Rules, adopted on April 24, 2018, provides: "(a) Policy and Purpose. The purpose of this rule is to eliminate the unfair exclusion of potential jurors based on race or ethnicity.

"(b) Scope. This rule applies in all jury trials.

"(c) Objection. A party may object to the use of a peremptory challenge to raise the issue of improper bias. The court may also raise this objection on its own. The objection shall be made by simple citation to this rule, and any further discussion shall be conducted outside the presence of the panel. The objection must be made before the potential juror is excused, unless new information is discovered.

"(d) Response. Upon objection to the exercise of a peremptory challenge pursuant to this rule, the party exercising the peremptory challenge shall articulate the reasons that the peremptory challenge has been exercised.

State *v.* Holmes

"(e) Determination. The court shall then evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances. If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied. The court need not find purposeful discrimination to deny the peremptory challenge. The court should explain its ruling on the record.

"(f) Nature of Observer. For purposes of this rule, an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State.

"(g) Circumstances Considered. In making its determination, the circumstances the court should consider include, but are not limited to, the following:

"(i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;

"(ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;

"(iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;

"(iv) whether a reason might be disproportionately associated with a race or ethnicity; and

"(v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

"(h) Reasons Presumptively Invalid. Because historically the following reasons for peremptory challenges have been associated with improper discrimination in jury selection in Washington State, the following are presumptively invalid reasons for a peremptory challenge:

"(i) having prior contact with law enforcement officers;

"(ii) expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling;

"(iii) having a close relationship with people who have been stopped, arrested, or convicted of a crime;

"(iv) living in a high-crime neighborhood;

"(v) having a child outside of marriage;

"(vi) receiving state benefits; and

"(vii) not being a native English speaker.

"(i) Reliance on Conduct. The following reasons for peremptory challenges also have historically been associated with improper discrimination in jury selection in Washington State: allegations that the prospective juror was sleeping, inattentive, or staring or failing to make eye contact; exhibited a problematic attitude, body language, or demeanor; or provided unintelligent or confused answers. If any party intends to offer one of these reasons or a similar reason as the justification for a peremptory challenge, that party must provide reasonable notice to the court and the other parties so the

State *v.* Holmes

in all jury trials and is intended "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." Wn. Gen. R. 37 (a) and (b). With respect to the issues in the present case, one particularly notable feature of General Rule 37 is a declaration—targeted to the second prong of *Batson*—that certain ostensibly race neutral explanations are "presumptively invalid," including distrust of law enforcement officers, not being a native English speaker, and residing in a high crime neighborhood. Wn. Gen. R. 37 (h); see also Wn. Gen. R. 37 (i) (requiring corroboration and verification on record of certain conduct based challenges). General Rule 37 also responds to implicit bias concerns by requiring the trial judge to consider "the reasons given to justify the peremptory challenge in light of the totality of circumstances. If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied. The court need not find purposeful discrimination to deny the peremptory challenge."[24] Wn. Gen. R. 37 (e); see also *State* v. *Jefferson*, supra, 192 Wn. 2d 229–30 (extending General Rule 37's modification of third prong of *Batson* with objective test to pending cases and reversing defendant's conviction because record indicated that "objective observer could view race or ethnicity as a factor in the use of the peremptory strike").

behavior can be verified and addressed in a timely manner. A lack of corroboration by the judge or opposing counsel verifying the behavior shall invalidate the given reason for the peremptory challenge."

[24] We note that General Rule 37 may well be subject to consideration in at least one other jurisdiction, as a defendant has sought review by the Arizona Supreme Court of an Arizona Court of Appeals decision that relied on its intermediate role in the hierarchal system to decline an invitation to "adopt the approach to peremptory challenges established in Washington, which carves out a list of reasons presumed invalid and expands the third step of the *Batson* analysis to include an 'objective observer' standard." *State* v. *Gentry*, Ariz. , 449 P.3d 707 (App. 2019), petition for review filed (Ariz. August 23, 2019) (CR-19-0273-PR).

State *v.* Holmes

Accordingly, we refer the systemic considerations identified in part II A of this opinion to a Jury Selection Task Force that will be appointed by the Chief Justice forthwith. We anticipate that the Jury Selection Task Force will consist of a diverse array of stakeholders from the criminal justice and civil litigation communities and will be better suited to engage in a robust debate to consider the "legislative facts"[25] and propose necessary solutions to the jury selection process in Connecticut, ranging from ensuring a fair cross section of the community on the venire at the outset to addressing aspects of the voir dire process that diminish the diversity of juries in Connecticut's state courts.[26]

[25] "[I]t is well established that an appellate court may take notice of legislative facts, including historical sources and scientific studies, which help determine the content of law and policy, as distinguished from the adjudicative facts, which concern the parties and events of a particular case." (Internal quotation marks omitted.) *State* v. *Santiago*, 318 Conn. 1, 53 n.44, 122 A.3d 1 (2015). "Legislative facts may be judicially noticed without affording the parties an opportunity to be heard, but adjudicative facts, at least if central to the case, may not." (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 314 Conn. 479. Particularly because many of the relevant issues have not yet been presented to us through the crucible of the adversarial process, we deem it advisable to stay our hand in favor of the rule-making process, which is better suited to consider the array of relevant studies and data in this area, along with the interests of the stakeholders, and to promote diversity on juries in Connecticut's state courts. See id., 481–82.

[26] We note that the Jury Selection Task Force may well recommend that the applicability of some *Batson* reforms be limited to criminal cases, given the fundamental difference between a criminal trial—which brings the resources of the government to bear against a private citizen—and one between private litigants. Cf. M. Howard, "Taking the High Road: Why Prosecutors Should Voluntarily Waive Peremptory Challenges," 23 Geo. J. Legal Ethics 369, 373–74 (2010) (Discussing prosecutors' "ethical duty to 'seek justice' " and noting that peremptory challenges are "a prophylactic safeguard of a constitutional right to an impartial jury" that "are subject to cost-benefit scrutiny prompting an assessment of the extent to which the practice risks unconstitutional discrimination, damaging both the actual and perceived fairness of the prosecution process, as well as the extent to which the practice actually increases the likelihood of a just conviction. And in balancing the two, is the benefit of one outweighed by the detriment to the other?" [Footnote omitted.]); see also id., 375 ("I argue for an office policy directing prosecutors to waive peremptory challenges except in narrowly

State *v.* Holmes

See *State* v. *Saintcalle*, supra, 178 Wn. 2d 52–53 ("we seek to enlist the best ideas from trial judges, trial lawyers, academics, and others to find the best alternative to the *Batson* analysis"); see also *Seattle* v. *Erickson*, 188 Wn. 2d 721, 739, 398 P.3d 1124 (2017) (Stephens, J., concurring) ("The court has convened a work group to carefully examine the proposed court rule with the goal of developing a meaningful, workable approach to eliminating bias in jury selection. That process will be informed by the diverse experiences of its participants and will be able to consider far broader perspectives than can be heard in a single appeal. Unconstrained by the limitations of the *Batson* framework, the rule-making process will be able to consider important policy concerns as well as constitutional issues.").

Although we observed in *State* v. *Holloway*, supra, 209 Conn. 645, that "the issue of purposeful racial discrimination in the state's use of peremptory jury challenges is a matter of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole," we now have the advantage of more than three decades of research and experience since *Batson* to tell us that implicit bias may be equally as pernicious and destructive to the perception of the justice system. Accordingly, we anticipate that the Jury Selection Task Force will propose meaningful changes to be implemented via court rule or legislation, including, but not limited to (1) proposing any necessary changes to General Statutes § 51-232 (c),[27] which governs the confirmation form

---

defined circumstances, such as curing a failed challenge for cause by either party or excusing a juror who demonstrates an unwillingness to deliberate in good faith").

[27] General Statutes § 51-232 (c) provides: "The Jury Administrator shall send to a prospective juror a juror confirmation form and a confidential juror questionnaire. Such questionnaire shall include questions eliciting the juror's name, age, race and ethnicity, occupation, education and information usually raised in voir dire examination. The questionnaire shall inform the prospective juror that information concerning race and ethnicity is required

State *v.* Holmes

and questionnaire provided to prospective jurors, (2) improving the process by which we summon prospective jurors in order to ensure that venires are drawn from a fair cross section of the community that is representative of its diversity, (3) drafting model jury instructions about implicit bias, and (4) promulgating new substantive standards that would eliminate *Batson*'s requirement of purposeful discrimination. Cf. *Newland* v. *Commissioner of Correction*, 322 Conn. 664, 686 n.7, 142 A.3d 1095 (2016) (expressing preference that Rules Committee of Superior Court consider and adopt prophylactic rules, rather than Supreme Court exercising its supervisory powers, because "the Rules Committee of the Superior Court . . . provides a more appropriate forum in which to fully and fairly consider any potential amendment to the procedural rules"). Accordingly, we "hope . . . that our decision sends the clear message that this court is unanimous in its commitment to eradicate racial bias from our jury system, and that we will work with all partners in the justice system to see this through."[28] *Seattle* v. *Erickson*, supra, 188 Wn. 2d 739 (Stephens, J., concurring).

---

solely to enforce nondiscrimination in jury selection, that the furnishing of such information is not a prerequisite to being qualified for jury service and that such information need not be furnished if the prospective juror finds it objectionable to do so. Such juror confirmation form and confidential juror questionnaire shall be signed by the prospective juror under penalty of false statement. Copies of the completed questionnaires shall be provided to the judge and counsel for use during voir dire or in preparation therefor. Counsel shall be required to return such copies to the clerk of the court upon completion of the voir dire. Except for disclosure made during voir dire or unless the court orders otherwise, information inserted by jurors shall be held in confidence by the court, the parties, counsel and their authorized agents. Such completed questionnaires shall not constitute a public record."

[28] We note that numerous commentators and jurists, including United States Supreme Court Justices Stephen Breyer and Thurgood Marshall, have suggested that nothing short of the complete abolition of peremptory challenges will suffice to address discrimination in jury selection. See, e.g., *Miller-El* v. *Dretke*, 545 U.S. 231, 273, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (Breyer, J., concurring); *Batson* v. *Kentucky*, supra, 476 U.S. 107 (Marshall, J., concurring); *State* v. *Veal*, supra, 930 N.W.2d 340 (Cady, C. J.,

State *v.* Holmes

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, McDONALD, KAHN and ECKER, Js., concurred.

MULLINS, J., with whom D'AURIA, J., joins, concurring. I agree with and join the majority's thoughtful and well reasoned opinion. In particular, I wholeheartedly endorse the majority's decision in part II B of its opinion to create a Jury Selection Task Force to identify and implement corrective measures for combatting the dis-

concurring); *People* v. *Brown*, 97 N.Y.2d 500, 509, 769 N.E.2d 1266, 743 N.Y.S.2d 374 (2002) (Kaye, C. J., concurring); *Davis* v. *Fisk Electric Co.*, 268 S.W.3d 508, 529 (Tex. 2008) (Brister, J., concurring); *Seattle* v. *Erickson*, supra, 188 Wn. 2d 739–40 (Yu, J., concurring); *State* v. *Saintcalle*, supra, 178 Wn. 2d 70–71 (Gonzalez, J., concurring); M. Bennett, supra, 4 Harv. L. & Policy Rev. 167; N. Marder, "*Foster* v. *Chatman*: A Missed Opportunity for *Batson* and the Peremptory Challenge," 49 Conn. L. Rev. 1137, 1205 (2017). As the state aptly observes—and as Justice Mullins acknowledges in his concurring opinion, in which he advocates for "substantially reduc[ing] the number of peremptory challenges that the parties have available for their use"—this specific remedy raises serious state constitutional questions. See Conn. Const., art. 1, § 19, as amended by art. IV of the amendments to the constitution ("The right of trial by jury shall remain inviolate . . . . In all civil and criminal actions tried by a jury, *the parties shall have the right to challenge jurors peremptorily*, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate." [Emphasis added.]); *Rozbicki* v. *Huybrechts*, 218 Conn. 386, 392 n.2, 589 A.2d 363 (1991) ("[t]he provisions concerning peremptory challenges and the individual voir dire appear to be unique to Connecticut's constitution"); see also *Rivera* v. *Illinois*, 556 U.S. 148, 152, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009) ("The right to exercise peremptory challenges in state court is determined by state law. This [c]ourt has long recognized that peremptory challenges are not of federal constitutional dimension. . . . States may withhold peremptory challenges altogether without impairing the constitutional guarantee of an impartial jury and a fair trial." [Citation omitted; internal quotation marks omitted.]). As was emphasized at oral argument before this court, the defendant has not requested that we consider abolishing peremptory challenges as a matter of law, so we do not consider further this more drastic remedy, not yet embraced by any state. See *State* v. *Saintcalle*, supra, 117 (Gonzalez, J., concurring). Accordingly, we leave it to the rule-making process to address the systemic issues identified by the defendant in this appeal.

State *v.* Holmes

criminatory use of peremptory challenges beyond the framework set forth in *Batson* v. *Kentucky*, 476 U.S. 79, 96–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). I write separately because, in my view, it is time not only to reconsider the framework of the *Batson* challenge in order to eliminate discrimination in jury selection but also to consider substantially restricting the use of peremptory challenges altogether.

Peremptory challenges by their very nature invite corruption of the judicial process by allowing—almost countenancing—discrimination. The credibility and integrity of our system of justice should not tolerate prospective jurors being prevented from serving on juries on the basis of discrimination due to their race, ethnicity, gender or religious affiliation. The straightest line to eliminating such discrimination would be to elim- inate the peremptory challenge. In our state, in light of article first, § 19, of the Connecticut constitution, as amended by article IV of the amendments, outright elim- ination of the peremptory challenge would raise consti- tutional concerns. However, nothing in our constitution prevents the next best thing, which would be to substan- tially reduce the number of peremptory challenges that the parties have available for their use.

I

As the majority opinion cogently sets forth, the *Bat- son* framework has proven to be wholly inadequate to address the discriminatory use of peremptory chal- lenges. There are, however, more fundamental prob- lems with peremptory challenges that should lead us to question whether any reforms short of reducing the parties' access to peremptory challenges will meaning- fully reduce the discriminatory effects that they have on the selection of jurors.

The problem of discrimination in peremptory chal- lenges stems from the following systemic issues: (1)

State *v.* Holmes

the historical use of peremptory challenges as a means of excluding African-Americans from jury service; (2) peremptory challenges lead inescapably to parties striking prospective jurors on the basis of speculation and stereotypes; (3) peremptory challenges are often based on unconscious biases and justifications that are ostensibly race neutral but that have a disparate impact on minority jurors; and (4) peremptory challenges lead to violations of the constitutional rights not just of the parties but also of the prospective jurors.

A

First, peremptory challenges have a history of being used as a tool of racial discrimination. Until *Batson* was decided in 1986, the United States Supreme Court expressly countenanced the use of peremptory challenges to strike jurors on account of their race. See *Swain* v. *Alabama*, 380 U.S. 202, 220–21, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), overruled by *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

Emphasizing the inherent conflict between peremptory challenges and equal protection principles, the United States Supreme Court concluded: "[W]e cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. . . . To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the [e]qual [p]rotection [c]lause would entail a radical change in the nature and operation of the challenge. The challenge, pro tanto, would no longer be peremptory, each and every challenge being open to examination . . . . And a great many uses of the challenge would be banned."[1] *Swain* v. *Alabama*, supra, 380 U.S. 221–22.

[1] In *Swain*, the United States Supreme Court recognized that the use of peremptory challenges to exclude African-American jurors violated the equal protection clause only if there was evidence that the state did so in virtually every single case and that no African-Americans were ever selected to serve on juries. *Swain* v. *Alabama*, supra, 380 U.S. 223–24. This requirement later was recognized as "impos[ing] a crippling burden of proof that left

State *v.* Holmes

Although *Swain* was eventually overruled by *Batson*, this long held understanding, that it was acceptable to strike prospective jurors on the basis of their race, has left an indelible mark on the use of peremptory challenges.

I acknowledge that the problem extends beyond race and into discrimination on the basis of ethnicity, gender, and religious affiliation, which also are entitled to protection under the *Batson* framework. See *J. E. B.* v. *Alabama*, 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994); *State* v. *Hodge*, 248 Conn. 207, 244–45, 726 A.2d 531 (1999). The *Batson* framework, however, is equally ineffective in addressing discrimination on these bases as well.

B

Second, peremptory challenges lead inescapably to parties striking prospective jurors purely on the basis of speculation and stereotypes. Unlike challenges for cause, where the prospective juror's partiality is articulable, "the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable." *Swain* v. *Alabama*, supra, 380 U.S. 220. "With limited information and time, and a lack of any reliable way to determine the subtle biases of each prospective juror, attorneys tend to rely heavily on stereotypes and generalizations in deciding how to exercise peremptory challenges." *State* v. *Saintcalle*, 178 Wn. 2d 34, 81, 309 P.3d 326 (2013) (Gonzalez, J., concurring).

It is almost inevitable that this expedient resort to stereotypes will invoke improper racial and other discriminatory considerations. I submit that decisions to exclude a prospective juror on the basis of stereotypes,

prosecutors' use of peremptories largely immune from constitutional scrutiny." (Internal quotation marks omitted.) *Miller-El* v. *Dretke*, 545 U.S. 231, 239, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005).

State *v.* Holmes

whether based on racial or other discriminatory considerations that have nothing to do with the juror's ability to fairly assess the evidence and follow legal instructions given by the judge, have no place in our system of selecting jurors.

C

Third, as discussed in the majority opinion, there are two especially elusive problems with peremptory challenges: (1) unconscious or implicit bias; and (2) lines of voir dire questioning that are race neutral but that have a disparate impact on minority jurors. Although these forms of discrimination are not purposeful, their consequences are no less pernicious. Both result in minorities being disproportionately excluded from jury service. This brand of exclusion has the effect of reducing diversity in our juries and perpetuating a mistrust of our justice system, particularly among those in the communities disparately impacted by these challenges. See *State* v. *Holmes*, 176 Conn. App. 156, 197–99, 169 A.3d 264 (2017) (*Lavine, J.*, concurring); *State* v. *Saintcalle*, supra, 178 Wn. 2d 100 (Gonzalez, J., concurring).

Regarding unconscious or implicit bias, Justice Marshall explained in *Batson* that ''[a] prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported.'' *Batson* v. *Kentucky*, supra, 476 U.S. 106 (Marshall, J., concurring).

A number of judges and commentators have argued that the only way to meaningfully combat the effects of implicit bias on peremptory challenges is to limit or eliminate them. See *Rice* v. *Collins*, 546 U.S. 333, 343,

State *v.* Holmes

126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (Breyer, J., concurring) (In suggesting that peremptory challenges should be abolished, Justice Breyer noted that, "sometimes, no one, not even the lawyer herself, can be certain whether a decision to exercise a peremptory challenge rests upon an impermissible racial, religious, gender-based, or ethnic stereotype. . . . How can trial judges second-guess an instinctive judgment the underlying basis for which may be a form of stereotyping invisible even to the prosecutor?" [Citations omitted.]); A. Page, "*Batson*'s Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge," 85 B.U.L. Rev. 155, 246 (2005) ("The psychological research . . . demonstrates the prevalence of unconscious, automatic stereotype use and the difficulty in eradicating it, even among those who are not of a mind to discriminate. This finding provides one more powerful reason to eliminate the peremptory challenge.").

The problem of lines of voir dire questioning that have a disparate impact on minorities is equally complex. Our case law, as the majority opinion notes, has held that ostensibly race neutral reasons for striking a juror—such as, in this case, the juror's negative views about law enforcement—pass muster under *Batson* even though they disproportionately affect minority jurors. See *State* v. *King*, 249 Conn. 645, 666–67, 735 A.2d 267 (1999); *State* v. *Hodge*, supra, 248 Conn. 230–31; *State* v. *Smith*, 222 Conn. 1, 13–14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); see also *Hernandez* v. *New York*, 500 U.S. 352, 359–60, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991).

Throughout history and continuing through the present day, relations between the police and many minorities and minority communities have been strained and highly contentious. Recently, police killings of African-American men and women have been highly publicized. Unfortunately, while the heightened publicity around

State *v.* Holmes

these cases is new, these stories are not new. We cannot turn a blind eye to that reality. To permit an honest venireperson who expresses that experience to be prevented from service on a jury is unacceptable.[2] I therefore echo the sentiments of the Appellate Court majority that "permitting the use of peremptory challenges with respect to potential jurors who express negative views toward the police or the justice system may well result in a disproportionate exclusion of minorities from our juries, a deeply troubling result." *State* v. *Holmes*, supra, 176 Conn. App. 181 n.5. Indeed, as Judge Lavine thoughtfully set forth in his concurring opinion in the Appellate Court, the effects of these types of challenges are immensely damaging to our juries and to the perception of our justice system. See id., 197–99 (*Lavine, J.*, concurring).

Adequate solutions to this problem are hard to come by, due in no small part to the innumerable permutations of disparate impact questions. In light of the complexity of these problems, I believe that outright elimination of, or at least a substantial reduction in access to, peremptory challenges is the most effective way to lessen the discrimination that arises from peremptory challenges.

D

Finally, it is important to remember that every time a discriminatory, peremptory strike goes unchallenged or such a strike passes muster in our courts, it violates the equal protection rights not only of the affected par-

---

[2] Judge Lavine, in his concurring opinion in the Appellate Court in this case, provides other examples of experiences that a venireperson of a particular suspect class may honestly reveal that may subject him or her to being stricken from the jury. See *State* v. *Holmes*, supra, 176 Conn. App. 197 (*Lavine, J.*, concurring). I agree with his examples and find it unacceptable for an individual to be excluded from service on a jury merely because he or she has experiences common to his or her race, ethnicity or gender that a party considers to be objectionable for service on a jury.

State *v.* Holmes

ties but also of the individual jurors who were improperly stricken. See *Powers* v. *Ohio*, 499 U.S. 400, 409, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) (The equal protection clause prohibits prosecutors from "exclud[-ing] otherwise qualified and unbiased persons from the petit jury solely by reason of their race, a practice that forecloses a significant opportunity to participate in civic life. An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race."). "[W]ith the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." Id., 407. A procedure that permits qualified jurors to be excluded from jury service because of their race, ethnicity, gender or religious affiliation is irreconcilable with promoting the legitimacy and credibility of our justice system.

In my view, the importance of these rights should lead us to question whether they should be left to self-interested parties who, as previously explained, often are acting on the basis of stereotypical judgments. Citizens should not be deprived of the opportunity to serve on a jury in the absence of an acceptable and identifiable reason. Our system takes that into account with the challenge for cause. The peremptory challenge allows too much discrimination to seep into the decision to strike a prospective juror.

II

Having identified the systemic problems associated with peremptory challenges, I now consider the constitutional and policy considerations involved in addressing these problems. I acknowledge at the outset that, although there is no right to peremptory challenges under the federal constitution; see *Georgia* v. *McCollum*, 505 U.S. 42, 57, 112 S. Ct. 2348, 120 L. Ed. 2d 33

State *v.* Holmes

(1992); total elimination of peremptory challenges may not be possible in this state. This is because article first, § 19, of the Connecticut constitution was amended in 1972 to include the following provision: "In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. . . ." Conn. Const., amend. IV.

I make two observations here. First, our constitution does not prescribe any minimum number of peremptory challenges that parties are entitled to; see Conn. Const., amend. IV; leaving that to be determined by the legislature. See General Statutes § 51-241 (providing each party with three peremptory challenges in civil cases, subject to limitations); General Statutes § 54-82g (providing state and defendant each with between three and twenty-five peremptory challenges in criminal cases, depending on severity of crime charged). Thus, there does not appear to be any constitutional impediment to reducing the number of peremptory challenges available to parties.

Second, and more fundamental, although the language of the constitution affords the state a right to a peremptory challenge, the historical basis for that right is unclear. Historically, peremptory challenges have been recognized, not as a right belonging to the government, but as a tool for criminal defendants to protect themselves *from* the government. Indeed, this court described peremptory challenges several years before they were constitutionalized as "one of the most important rights secured to *the accused* . . . ." (Emphasis added; internal quotation marks omitted.) *DeCarlo* v. *Frame*, 134 Conn. 530, 533, 58 A.2d 846 (1948). This court has recognized peremptory challenges as a means of securing a criminal defendant's right to trial by a fair and impartial jury. See *State* v. *Hodge*, supra, 248 Conn. 217. The United States

State *v.* Holmes

Supreme Court has explained that the right to a trial by a fair and impartial jury "is granted to criminal defendants in order to prevent oppression by the [g]overnment." *Duncan* v. *Louisiana*, 391 U.S. 145, 155, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968).

Notwithstanding the fact that article first, § 19, of the Connecticut constitution, as amended by article four of the amendments, provides that "the parties" in a criminal action have the right to peremptory challenges, granting that right to the state seems incongruous with the other rights associated with criminal trials. Virtually all of the other trial related rights in a criminal case have as their basis the protection of the individual against the state.[3] Nevertheless, I understand that the language

---

[3] The right to a jury trial has been deemed fundamental because it safeguards the accused's rights against abuse of state power. See *Duncan* v. *Louisiana*, supra, 391 U.S. 155–56. Likewise, "[t]he right to counsel under the sixth amendment of the federal constitution protects a criminal defendant at critical stages of the proceedings from adversarial government agents . . . ." *State* v. *Piorkowski*, 243 Conn. 205, 215, 700 A.2d 1146 (1997); see also *Gideon* v. *Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (right to counsel is necessary to protect criminal defendants from government, which spends "vast sums of money to establish machinery to try defendants accused of crime"). The same is true of the sixth amendment right to a speedy trial; see *State* v. *Baker*, 164 Conn. 295, 296, 320 A.2d 801 (1973) ("[o]n its face, [the right to a speedy trial] is activated only when a criminal prosecution has begun and extends only to those persons who have been accused in the course of that prosecution" [internal quotation marks omitted]); and the fifth amendment right against self-incrimination. See *In re Samantha C.*, 268 Conn. 614, 634, 847 A.2d 883 (2004) ("fifth amendment privilege against self-incrimination . . . protects the individual against being involuntarily called as a witness against himself" [internal quotation marks omitted]). Similarly, the fourteenth amendment, which forbids the purposeful discrimination in the exercise of peremptory challenges, was designed to protect citizens from state action. See *State* v. *Holliman*, 214 Conn. 38, 43, 570 A.2d 680 (1990) (fourteenth amendment "prohibits the states from denying federal constitutional rights" and "applies to acts of the states, not to acts of private persons or entities" [internal quotation marks omitted]).

Moreover, article first, §§ 8 and 20, of the Connecticut constitution, which contain our state counterparts to these federal rights, by their express terms extend only to individual citizens or criminal defendants. See Conn. Const., art. I, § 8 (listing rights secured to "the accused" and providing that "[n]o

of the constitutional provision provides the state with peremptory challenges. However, given that the legal basis for the state's constitutional right to peremptory challenges in a criminal case is certainly open to question, I suggest that it is appropriate to consider whether the state should be entitled to an equal number of peremptory challenges as the accused in a criminal case. Instead, it may be appropriate, in a criminal case, to limit the number of peremptory challenges available to the state in greater measure than the number of peremptory challenges available to the defendant.

Apart from the constitutional question of whether limiting the number of peremptory challenges available to the state to a greater degree than the number available to the defendant would be permissible under our state constitution, there remains the question of whether providing criminal defendants with greater access to peremptory challenges than the state is appropriate as a matter of policy. Justice Marshall, for instance, rejected such disparate treatment in his concurring opinion in *Batson*, reasoning that "[o]ur criminal justice system 'requires not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.' " *Batson* v. *Kentucky*, supra, 476 U.S. 107 (quoting *Hayes* v. *Missouri*, 120 U.S. 68, 70, 7 S. Ct. 350, 30 L. Ed. 578 [1887]).

Others, however, have argued that, because only criminal defendants possess the constitutional right to a fair trial and impartial jury, their use of peremptory challenges should be preserved while prosecutors' use

person shall be compelled to give evidence against himself"); Conn. Const., art. I, § 20 ("[n]o person shall be denied the equal protection of the law"). The foregoing demonstrates that both the language and the origins of these trial related rights establish that their purpose is to protect the accused from the awesome power of the state. Conversely, there is no historical basis for the proposition that the state possesses constitutional trial related rights.

should be eliminated or reduced. See *Georgia* v. *McCollum*, supra, 505 U.S. 68 (O'Connor, J., dissenting) (arguing that *Batson* prohibition on race based peremptory challenges should not apply to criminal defendants because "[t]he concept that the *government alone* must honor constitutional dictates . . . is a fundamental tenet of our legal order . . . [and] [t]his is particularly so in the context of criminal trials, where we have held the prosecution to uniquely high standards of conduct" [emphasis added]).

These difficult constitutional and policy questions are not presently before this court and I make no attempt to answer them here. Instead, I write separately to emphasize that the problem of racial and other forms of discrimination in the use of peremptory challenges is extremely complex and the solution to the problem must take into account that complexity. To be sure, solutions may need to extend beyond the framework of the *Batson* challenge to encompass a substantial reduction in the availability of peremptory challenges.

———————————